IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SUSAN STOCKTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:15-cv-333 |
| | § | (JURY) |
| CHRISTUS HEALTH SOUTHEAST | § | |
| TEXAS D/B/A CHRISTUS HOSPITAL | § | |
| ST. ELIZABETH, | § | |
| | § | |
| Defendant. | § | |

<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Mark Siurek
TBA# 18447900
Fed ID# 9417
3334 Richmond, Suite 100
Houston, Texas  77098
713-522-0066 (telephone)
713-522-9977 (fax)
<u>msiurek@warrensiurek.com</u>

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

WARREN & SIUREK, L.L.P.
Patricia Haylon
TBA# 09281925
Fed ID #13941
3334 Richmond, Suite 100
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)
<u>thaylon@warrensiurek.com</u>

TABLE OF CONTENTS

DESCRIPTION                                                        PAGE

NATURE OF THE PROCEEDINGS...................................  1

SUMMARY OF THE ARGUMENT.....................................  1

FACTUAL BACKGROUND.........................................  2

APPLICABLE LEGAL STANDARDS.................................  10

     A. Summary Judgment...................................  10

ARGUMENT AND AUTHORITIES...................................  10

     A. Discrimination....................................  10

     B. Stockton was a Qualified Individual with
        a Disability......................................  11

     C. Adverse Employment Action.........................  12

     D. Stockton Replaced by Non-Disabled employee.........  13

     E. The Hospital Has No Legitimate Reason For
        Stockton's Separation.............................  13

     F. Failure to Accommodate............................  15

CONCLUSION.................................................  17

BIBLIOGRAPHY

CASE LAW                                                    PAGE

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986).......  10

Celotex Corp. V. Catrett, 477 U.S. 317 (1986)............  10

E.E.O.C. v. Chevron Phillips Chem. Co., 570 F.3d 606
 (5th Cir. 2009).........................................  11-12

E.E.O.C. v. LHC Grp., Inc., 773 F.3d 688 (5th Cir. 2014)...  15

Feist v. Louisiana, 730 F.3d 450 (5th Cir. 2013)...........  15

Loulseged v. Akzo Nobel, Inc., 178 F.3d 736
(5th Cir. 1999)........................................  15

Rachid v. Jack in the Box, Inc., 376 F.3d 305
(5th Cir. 2004)........................................  11


STATUTES                                                   PAGE

42 U.S.C. § 12112(a)(2015)..............................  10

42 U.S.C. § 12102(2)(2015)..............................  11

29 C.F.R. § 1630.2(i) (2015)...........................  11-12

INDEX OF EXHIBITS

EXHIBIT            DESCRIPTION

A                  Deposition of Susan Stockton

B                  Deposition of Dennsi LeBlanc

C                  Deposition of Marcia Worthy

D                  Declaration of Patricia Haylon

D-1                Discharge Instructions

D-2                request for a complete copy of the Injury
                   Assistance Plan document

D-3                response re: summary plan description is the formal
                   Injury Assistance Plan policy

D-4                reply seeking clarification based on conflicting
                   information

D-5                complete Injury Assistance Plan document contains
                   legal and medical terms

D-6                not allowed to give out complete Injury Assistance
                   Plan document

D-7                request to Appeals Committee for information
                   including complete copy of Injury Assistance Plan

D-8                response from Appeals Committee

D-9                Dr. Tonn's email stating Stockton should be
                   returned to work

D-10               reversal of determination to deny MRI

D-11               staff shortages

D-12               Stockton may not continue working in OB/GYN

D-13               several available positions

INDEX OF EXHIBITS

EXHIBIT          DESCRIPTION

D-14             concerns regarding Stockton's physical limitations

D-15             Stockton's request for accommodations

D-16             informed no positions in OB/GYN

D-17             TWC decision approving unemployment benefits

D-18             Stockton's calls regarding her benefits

D-19             Position Statement

D-20             Stockton is entitled to death benefits

D-21             retroactive termination

D-22             denial of death benefits

D-23             Dr. Figari's medical findings

E                Defendant's Answers to Plaintiff's First Set of
                 Interrogatories

F                Deposition of Charlotte Cunningham

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SUSAN STOCKTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:15-cv-333 |
| | § | (JURY) |
| CHRISTUS HEALTH SOUTHEAST | § | |
| TEXAS D/B/A CHRISTUS HOSPITAL | § | |
| ST. ELIZABETH, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE MARCIA CRONE:

Plaintiff Susan Stockton ("Stockton") timely files this Motion for Partial Summary Judgment as follows:

### NATURE OF THE PROCEEDING

1.    Defendant Christus Health Southeast Texas d/b/a Christus Hospital St. Elizabeth (the "Hospital") terminated Stockton's employment following a leave of absence caused by an on-the-job injury in violation of Stockton's rights under the Family Medical Leave Act (the "FMLA"), Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Americans with Disabilities Act (the "ADA"), as amended.

### SUMMARY OF THE ARGUMENT

2.    Here, Stockton seeks a finding that the Hospital violated her rights under the Americans with Disabilities Act (the "ADA"), as amended, as a matter of law by failing to place Stockton in the available positions for which she was qualified because of her

disability and by failing to engage in the required interactive process which would have allowed Stockton to return to work in her unit.

FACTUAL BACKGROUND

3.   The Hospital employs more five hundred (500) registered nurses and is considered an employer under both the FMLA, 29 U.S.C. § 2611(4)(A)(i) (2015), and the ADA, 42 U.S.C. § 12111(5) (2015). See Defendant's Answer to Plaintiff's First Amended Complaint, para. 7.

4.   Stockton, a registered nurse, was employed by the Hospital for nearly twenty (20) years in various departments from 1996 to 2015. See Exhibit "A," Deposition of Susan Stockton, pp. 39-41. Most recently, Stockton worked in the Hospital's OB/GYN Surgery Unit. See Exhibit "A," p. 41. Stockton's unit manager, Dennis LeBlanc ("LeBlanc"), considered Stockton to be a good nurse. See Exhibit "B," Deposition of Dennis LeBlanc, p. 26.

5.   Stockton's employment issues with the Hospital began when she was scheduled to undergo back surgery on April 22, 2014, to correct a long term condition. See Exhibit "A," pp. 62-63. About a week before her scheduled surgery, Stockton was asked to attend a meeting with her supervisor, Brenda Munoz ("Munoz"), and Marsha Worthy ("Worthy"), from human resources, to address a "staffing crisis" in Stockton's unit. See Exhibit "A," pp. 62-63; Exhibit "C," Deposition of Marsha Worthy, pp. 45-46.

6.    In the meeting, Stockton learned that another employee in her unit was scheduled for surgery at the same time.  See Exhibit "A," p. 67.  Stockton was questioned extensively regarding who would work for her during her absence.  See Exhibit "A," p. 65. Stockton felt pressured to postpone her surgery and left the meeting without knowing whether she would be able to have the surgery as scheduled.  See Exhibit "A," pp. 68-69.

7.    Later that day, Stockton slipped and fell at work injuring her right shoulder.  See Exhibit "A," p. 69.  She was seen in the Emergency Room and diagnosed with a fractured humorous.  See Exhibit "D," Declaration of Patricia Haylon; Exhibit "D-1," Stockton's Discharge Instructions.  Stockton filed a claim for benefits under the Hospital's Occupational Injury Assistance Plan (the "Injury Assistance Plan") which was an employer promulgated welfare benefit plan.  See Exhibit "A," pp. 71-72, 75; See also Defendant's Answer to Plaintiff's First Amended Complaint, para. 10.

8.    As a result of her injury, Stockton was on leave from work beginning April 14, 2014, though July 27, 2014.  See Exhibit "A," p. 77.  Stockton returned to work with restrictions under a ninety (90) day "Transitional Duty Plan."  See Exhibit "A," pp. 81-82.

9.    The Transitional Duty Plan required that Stockton either be released from all restrictions or find a position within the

Hospital that would accommodate her restrictions by October 28, 2014.[1] See Exhibit "A," pp. 94-95. According to the Transitional Duty Plan, a failure to do so could result in the termination of Stockton's employment. See Exhibit "A," p. 83.

10. To that end, Stockton saw her treating physician on September 22, 2014, who recommended an MRI of her shoulder. See Exhibit "A," p. 86. Rather than approve the MRI, the Injury Assistance Plan referred Stockton for an independent medical examination ("IME"). See Exhibit "A," p. 86; See Defendant's Answer to Plaintiff's First Amended Complaint, para. 13. The physician who performed the IME concluded that Stockton had reached her maximum medical improvement and released Stockton to return to work with permanent restrictions. See Exhibit "A," p. 89; See Defendant's Answer to Plaintiff's First Amended Complaint, para. 14.

11. In the absence of a necessary MRI, and as a result of the IME, Stockton's benefits under the Injury Assistance Plan were terminated. See Exhibit "A," p. 99. Stockton was given thirty (30) days to find a position that would accommodate her restrictions or her employment would be terminated. See Exhibit "A," p. 95.

12. Stockton immediately requested a copy of the Injury

---

1   Notwithstanding the requirements of the Transitional Duty Plan, LeBlanc testified that Stockton should have been allowed to work under the Transitional Duty Plan until she fully recovered. See Exhibit "C," p. 58.

Assistance Plan so that she could appeal the results of the IME. See Exhibit "D-2." In response, Stockton was told that the Summary Plan Description was the formal policy. See Exhibit "D-3." Stockton renewed her request for a complete copy of the Injury Assistance Plan and was told that it (i) was written in legal terms and (ii) was not given to employees. See Exhibits "D-4," "D-5," and "D-6." Stockton continued her requests with the assistance of the Department of Labor (the "DOL") and ultimately received a complete copy of the Injury Assistance Plan in February of 2015.[2]    See Exhibits "D-7" and "D-8."

13.    In the meantime, Stockton applied for a surgical quality assurance position with the Hospital on October 19, 2014.   See Exhibit "E," Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories. She also contacted LeBlanc asking if he was aware of any non-bedside care nursing positions, or alternatively, if he would keep Stockton in his unit in an adjusted role.   See Exhibit "D-11." However, Stockton was summarily informed by human resources that she could not continue to work in the OB/GYN unit. See Exhibit "D-12."

14.    Stockton also applied and interviewed for a clinical documentation specialist role.   See Exhibit "E."   Although the manager had several positions available, she expressed a concern to human resources regarding Stockton's "physical limitations."   See

---

2    Stockton's appeal was ultimately successful. See Exhibits "D-8" and "D-9."

Exhibits "D-13" and "D-14."

15.   Facing   termination,   Stockton   elected   to   have   her
previously scheduled back surgery on November 20, 2014.  See Exhibit
"A," p. 107-108.  While recovering from the back surgery, Stockton
sought and received a second opinion on her shoulder.  See Exhibit
"A," p. 111.   Dr. Figari agreed with Stockton's prior treating
physician noting that an MRI (already refused by the Hospital's
Injury Assistance Plan) was necessary before any determination could
be made regarding the permanency of Stockton's limitations.   See
Exhibit "A," p. 112.

16.  On January 6, 2015, Stockton sent an email to LeBlanc
requesting that she be allowed to continue in her transitional duty
role as a reasonable accommodation.  See Exhibit "A," p. 116;
Exhibit "B," p. 63; Exhibit "D-15.".  LeBlanc summarily denied the
request without ever responding to the email.  See Exhibit "B," pp.
64, 69.

17.  After receiving no response to her request, Stockton
personally paid for the MRI that had been previously denied by the
Hospital's Injury Assistance Plan.   See Defendant's Answer to
Plaintiff's First Amended Complaint, para. 16.  After reviewing the
MRI, Stockton's treating physician released her to return to work
without restrictions from her shoulder injury.  See Exhibit "A," p.
116.  Approximately one (1) month later, Stockton was released to
return to work without restrictions in connection with her

--6--

successful back surgery.  See Exhibit "A," p. 126.

18.  Stockton provided the releases from both physicians to the Hospital.  See Defendant's Answer to Plaintiff's First Amended Complaint, para. 17.   However, Stockton was informed that her position was no longer available.[3]  See Exhibit "A," p. 153; Exhibit "D-16."  Stockton was once again told that she had thirty (30) days to find a position or her employment would be terminated.  See Exhibit "A," p. 156.

19.  Stockton applied for numerous positions for which she was qualified within the Hospital.   See Exhibit "C," pp. 106-107; Exhibit "E," Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories.   Specifically, Stockton applied for the following positions.

```
Position:      RN (Quality Assurance)
Date Applied:  October 19, 2014

Position:      RN (Clinical Documentation Specialist)
Date Applied:  November 10, 2014

Position:      RN
Date Applied:  December 30, 2014

Position:      RN (Clinical Documentation Specialist)
Date Applied:  December 30, 2014

Position:      RN (Ambulatory Surgery)
Date Applied:  February 14, 2015

Position:      RN (OB/GYN)
Date Applied:  February 27, 2015

Position:      RN (Quality Management)
```

---

3    Stockton's position was filled after being held open for six (6) or seven (7) months.  See Exhibit "B," pp. 84-85.

Date Applied:   February 27, 2015

<u>See</u> Exhibit "E," Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories.

20.   Although Stockton was qualified for each of the above positions, none were offered to Stockton.  See Exhibit "C," pp. 106-107; Exhibit "E," Defendant's Answer to Plaintiff's First Amended Complaint, para. 20.   Each position was filled by a non-disabled person.  <u>See</u> Exhibit "B," pp. 22-23.

21.   At the conclusion of the thirty (30) day period, Stockton applied for unemployment benefits with the Texas Workforce Commission ("TWC").  <u>See</u> Exhibit "A," pp. 143, 145.  Although the Hospital told the TWC that Stockton was still employed, the TWC found that Stockton was eligible for benefits because she had been fired because of her medically verifiable illness.  <u>See</u> Exhibit "A," p. 156; Exhibit "D-17."

22.   Stockton also stopped receiving paychecks.  <u>See</u> Exhibit "A," p. 186.  She contacted the benefits resource center to find out how to maintain her insurance coverage.  <u>See</u> Exhibit "A," p. 156.  Stockton was told that she was still an active employee.  <u>See</u> Exhibit "A," p. 188.  Stockton asked the benefits resource center to send her written information regarding her benefits in the mail.  <u>See</u> Exhibit "A," p. 188.  Stockton made numerous calls to the benefits resource center for information on her benefits.  <u>See</u> Exhibit "D-18."

23.   On April 17, 2015, Stockton filed a Charge of

Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") based on the Hospital's violations of the ADA. See Exhibit "A," p. 174. In response, the Hospital told the EEOC that Stockton was still on a non-FMLA leave of absence beginning November 21, 2014. See Exhibit "D-19."

24. On August 15, 2015, Stockton's husband of almost forty (40) years passed away unexpectedly. See Exhibit "A," p. 189. Stockton filed a claim for benefits under the group life insurance policy maintained through the Hospital. See Exhibit "A," p. 189. The Hospital's benefits resource center advised Stockton that she was entitled to benefits. See Exhibit "D-20."

25. However, rather than pay Stockton's claim for benefits, the Hospital elected to retroactively terminate Stockton's employment as of April 21, 2015. See Exhibit "C," pp. 111-112; Exhibit "D-21." Liberty Mutual then denied the claim on October 2, 2015, because Stockton was not an active employee. See Exhibit "A," p. 190; Exhibit "D-21" In other words, the Hospital intentionally foreclosed Stockton's claim for benefits following the death of her husband.

26. Stockton filed the present lawsuit complaining of her separation from employment in violation of her rights under the FMLA, ERISA, and the ADA.

## APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

27.   Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the pleadings, discovery products, and affidavits on file show that there are no genuine issues of material facts and that the moving party is entitled to summary judgment as a matter of law. Celotex Corp. V. Catrett, 477 U.S. 317, 326 (1986). Only disputes over facts that might affect the outcome of the suit will properly preclude summary judgment. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). A party opposing a motion for summary judgment may not rest upon the allegations of her pleadings but rather, must set forth specific facts showing that there are genuine issues for trial. Anderson at 247-248. Applied here, the Company has failed to demonstrate its entitlement to summary judgment.

### ARGUMENT AND AUTHORITIES

### A. Discrimination

28.   The ADA provides that no covered entity shall discriminate against a qualified individual on the basis of disability of such individual in regard to the hiring, advancement, or discharge of employees, ... and other terms, conditions and privileges of employment. 42 U.S.C. § 12112(a) (2015).

29.   To establish a prima facie case of discrimination, Stockton must show: (i) she was disabled, has a record of having a

disability, or is regarded as disabled; (ii) she was qualified for the job; (iii) she was subjected to an adverse employment action on account of her disability or the perception of her disability; and (iv) she was replaced by or treated less favorably than non-disabled employees. E.E.O.C. v. Chevron Phillips Chem. Co., 570 F.3d 606, 615 (5th Cir. 2009). At that point, the burden shifts to the Hospital to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Chevron Phillips, 570 F.3d at 615. The trier of fact can then consider the evidence presented in the prima facie case and any other evidence to determine whether the proffered reason was pretextual or, while true, was only one of the reasons for the adverse action and another motivating factor was Stockton's disability. Chevron Phillips, 570 F.3d at 615; Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).

30. Applied here, Stockton was a qualified individual with a disability who was not "hired" into positions because of her disability that were filled by non-disabled individuals.

B. Stockton was a Qualified Individual with a Disability

31. The ADA defines disability as: (i) a physical or mental impairment that substantially limits one or more major life activities; (ii) a record of such an impairment; or (iii) being regarded as having such an impairment. 42 U.S.C. § 12102(2) (2015). Of note here, the implementing regulations provide a list of major activities which specifically includes lifting. 29 C.F.R. §

-11-

1630.2(i) (2015).

32.  Here, the IME's conclusions state that Stockton's inability to lift following her injury on April 14, 2014, was a permanent condition.  The Hospital, aware of the IME's findings, told Stockton that she would have to find a new position that accommodated these restrictions.   Consequently, Stockton had a disability as well as having a record of a disability.[4]

33.  In addition, the Hospital concedes that Stockton is a good nurse who was qualified for each of the positions for which she was hired or applied.  See Exhibit "B," p. 26; Exhibit "C," p. 35.

34.  As a result, Stockton was a qualified individual with a disability from the day that she returned to work with restrictions on July 28, 2014, through the date of her termination.

### C. Adverse Employment Action

35.  In this case, Stockton was not allowed to return to her position following her injury.  At a minimum, Stockton lost her job because of her disability.

36.  Moreover, Stockton applied for seven (7) positions within the Hospital that she could perform with or without accommodation. Despite her long standing employment with the Hospital in various departments, Stockton was declined for each position.  In addition, one manager with several open positions overtly expressed concern about Stockton's disability.  See Exhibit "D-14."

---

4    The relevant time for assessing the existence of a disability is the time of the adverse employment action.  Chevron Phillips, 570 F.3d at 618.

37.   Even after Stockton was released from her restrictions in January of 2015, she was not allowed to return to work.   Notably, Stockton's unit coordinator put in a requisition to replace Stockton in June of 2015 and never considered putting Stockton back in the position even though she was aware that Stockton's restrictions had been lifted.   See Exhibit "F," Deposition of Charlotte Cunningham, pp. 62-64; Exhibit "F-5" (Requisition).

38.   Simply put, Stockton, a qualified individual, was separated from employment because of her disability.

D. Stockton Replaced By Non-Disabled Employee

39.   Stockton's position was filled by a non-disabled person. See Exhibit "C," p. 84; Exhibit "B," pp. 22-23.

E. The Hospital Has No Legitimate Reason
For Stockton's Separation

40.   At the time of her injury, Stockton had been employed by the Hospital for more than eighteen (18) years.   See Exhibit "A," p. 39.   She began in the cardiovascular intensive care unit and later worked in the post anesthesia care unit, the interventional radiology department, and in OB/GYN.   See Exhibit "A," p. 39.   As part of the OB/GYN unit, Stockton worked in pre-op, surgery, post anesthesia care, and the step down area where patients are discharged.   See Exhibit "A," pp. 54-55.   As is readily apparent, Stockton had significant experience within the Hospital and possessed a variety of nursing skills.

41.   Nevertheless, the Hospital contends that Stockton was not

transferred into any of the open positions, including one in OB/GYN, because there were more qualified candidates. See Exhibit "C," p. 35. At a minimum, it is highly unlikely that Stockton would not be the most qualified candidate for an open position in the OB/GYN department at the very Hospital where she worked in OB/GYN prior to her injury. Secondly, there is no evidence as to how and by whom those positions were filled. What is known, however, is that the manager with several open positions expressly raised concerns about Stockton's disability. See, Exhibit "D-14."

42.  Finally, there is no reason offered as to why Stockton was not put back in her unit once her restrictions were lifted. When the unit coordinator put in the requisition to replace Stockton (identifying Stockton by name), she never considered Stockton for the position even though she knew that Stockton's restrictions had been lifted. See Exhibit "F," pp. 62-64; Exhibit "F-5" (Requisition). When asked why Stockton was not considered, the unit coordinator had no answer. See Exhibit "F," p. 64.

43.  To sum up briefly, Stockton was a qualified individual who was separated from her employment because of her disability. Further, the reasons for the separation, to the extent reasons were offered, are unsupported by evidence and unworthy of credence. As such, Stockton respectfully requests that the Court grant her Motion for Partial Summary Judgment on this basis.

F. <u>Failure to Accommodate</u>

44. Illegal discrimination under the ADA includes failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A) (2015). To prevail in a failure to accommodate claim, Stockton must show: (i) she was a qualified individual with a disability; (ii) the disability and its consequential limitations were known to the employer; and (iii) the employer failure to make reasonable accommodations for such limitations. <u>Feist v. Louisiana</u>, 730 F.3d 450, 452 (5th Cir. 2013). Under the ADA, a reasonable accommodation may include job restructuring, modified work schedules, and reassignment to a vacant position. <u>Feist</u>, 730 F.3d at 453.

45. Once an employee makes a request for an accommodation, the employer is required to engage in an interactive process so that together they can determine what reasonable accommodations might be available. <u>E.E.O.C. v. LHC Grp., Inc.</u>, 773 F.3d 688, 599 (5th Cir. 2014). When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA. <u>Loulseged v. Akzo Nobel, Inc.</u>, 178 F.3d 731, 736 (5th Cir. 1999).

46. Applied here, Stockton sent a request for reasonable accommodations to LeBlanc in writing on January 6, 2015. <u>See</u> Exhibit "D-15." Stockton asked that she be allowed to work in the

pre-op area of the OB/GYN unit similar to the work that she performed during the Transitional Duty Plan.  See Exhibit "D-15." Three (3) days later, Stockton sent LeBlanc records from her treating physician, Dr. Figari, documenting his findings during a recent visit.  See Exhibit "D-23."

47.  Dr. Figari noted that the treatment of choice was the previously denied MRI.  See Exhibit "D-23."  He believed that it was premature to conclude Stockton's restrictions were permanent because if the diagnosis turned out to be a rotator cuff tear, it could be repaired.  See Exhibit "D-23."

48.  It was within LeBlanc's discretion to grant Stockton's request.  See Exhibit "B," p. 64.  However, LeBlanc never responded to the request because he believed that Stockton's restrictions would put an undue burden on the department.  See Exhibit "B," p. 64.  In other words, LeBlanc conceded that he never engaged in an interactive process with Stockton in response to her request for accommodation.

49.  If LeBlanc had talked to Stockton, he would have learned that Stockton was scheduled to have the desired MRI.  In fact, approximately one (1) week after Stockton requested accommodation from LeBlanc, she had completed the MRI study and was fully released to return to work without restrictions by Dr. Figari.  See Exhibit "D-23."

50.  As such, any accommodation would have been for a very

limited period of time.   Consequently, had LeBlanc engaged in the required interactive process, he would have known that (i) his concerns were unfounded and (ii) Stockton's request would not burden the department.   Given that LeBlanc considered Stockton to be a good nurse and wanted her back in his unit, it is fair to say that, but for his failure to engage in the interactive process, Stockton would have returned to work.   <u>See</u> Exhibit "B," p. 72.

CONCLUSION

51.   The Hospital violated the ADA by discriminating against Stockton when it failed to transfer Stockton to vacant positions for which she was qualified.   In addition, the Hospital violated the ADA by failing to engage in an interactive process in response to Stockton's request for accommodation which would have precluded her separation of employment.   Therefore, Stockton respectfully requests that the Court grant her Motion for Partial Summary Judgment.

Respectfully submitted,


/S/ Mark Siurek
Mark Siurek
TBA# 18447900
Federal ID# 9417
3334 Richmond Avenue, Suite 100
Houston, Texas   77098
713-522-0066 (telephone)
713-522-9977 (fax)
msiurek@warrensiurek.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

WARREN & SIUREK, L.L.P.
Patricia Haylon
TBA# 09281925
Federal ID# 13941
3334 Richmond Avenue, Suite 100
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)
thaylon@warrensiurek.com

## CERTIFICATE OF DELIVERY

I hereby certify that, in addition to service automatically accomplished through the Notice of Electronic Filing, a true and correct copy of the foregoing Plaintiff's Motion for Partial Summary Judgment was sent to the following by fax and/or by email on October 21, 2016, properly addressed as follows:

A. Kevin Troutman (ktroutman@laborlawyers.com)
Mauro Ramirez (mramirez@laborlawyers.com)
Fisher & Phillips L.L.P.
333 Clay, Suite 4000
Houston, Texas  77002
713-292-0151 (fax)

/S/ Mark Siurek
Mark Siurek