IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SUSAN STOCKTON, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:15-cv-333 |
| | § | (JURY) |
| CHRISTUS HEALTH SOUTHEAST | § | |
| TEXAS D/B/A CHRISTUS HOSPITAL | § | |
| ST. ELIZABETH, | § | |
| | § | |
|     Defendant. | § | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Mark Siurek
TBA# 18447900
Federal ID# 9417
3334 Richmond Avenue, Suite 100
Houston, Texas  77098
713-522-0066 (telephone)
713-522-9977 (fax)
msiurek@warrensiurek.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

WARREN & SIUREK, L.L.P.
Patricia Haylon
TBA# 09281925
Federal ID# 13941
3334 Richmond Avenue, Suite 100
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)
thaylon@warrensiurek.com

TABLE OF CONTENTS

DESCRIPTION                                                    PAGE

NATURE AND STAGEOF THE PROCEEDINGS.........................  1

SUMMARY OF THE ARGUMENT....................................  1

RESPONSE TO DEFENDANT'S FACTUAL ALLEGATIONS...............  2

PLAINTIFF'S MATERIAL FACTS.................................  3

SUMMARY JUDGMENT STANDARD..................................  8

ARGUMENT AND AUTHORITIES...................................  9

    A. Stockton was a Qualified Individual with
      a Disability.......................................  10

    1. Failure to Engage in Interactive Process..........  12

    B. Stockton Was Subjected to Adverse Employment
      Decisions Because of Her Disability................  13

    1. Stockton's OB/GYN Position........................  14

    2. Case Management Positions.........................  15

    3. The Outpatient Pavillion..........................  16

OBJECTIONS TO INADMISSIBLE EVIDENCE........................  18

CONCLUSION.................................................  22

BIBLIOGRAPHY

CASE LAW                                                          PAGE

Burress v. City of Franklin, 809 F.Supp.2d 795
(N.D. Tenn. 2011)......................................   12

Celotex Corp. V. Catrett, 477 U.S. 317 (1986)............   9

Cehrs v. Ne. Ohio Alzheimer's Research Center,
155 F.3d 775 (6th Cir. 1998).............................   11

Contreras v. United States Bank Nat'l Ass'n,
2015 U.S. LEXIS 11551 *2 (S.D. Tex. February 2, 2015).....  18-19

E.E.O.C. v. Chemtech, 1995 U.S. Dist. LEXIS
21878 at *4 (S.D. Tex. July 21, 1995)....................   11

E.E.O.C. v. LHC Grp., Inc., 773 F.3d 688 (5th Cir. 2014)...  9, 12

Galindo v. Precision Am. Corp., 754 F.2d 1212
(5th Cir. 1985)..........................................   19

Gossett v. Du-Ra-Kel Corp., 569 F.2d 869 (5th Cir. 1978)...  18

Loulseged v. Akzo Nobel, Inc., 178 F.3d 736
(5th Cir. 1999)..........................................   13

Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955
(10th Cir. 2002).........................................   11

United States ex rel. King v. Solvay, S.A.,
2015 U.S. Dist. LEXIS 132286 at *10
(S.D. Tex. September 30, 2105)...........................   20

Villalon v. Del Mar College Dist., 2010 U.S. Dist.
LEXIS 82766 at *23 (S.D. Tex. August 13, 2010)...........   11

Wilkerson v. Boomerang Tube, LLC, 2014 U.S. Dist.
LEXIS 146695 (E.D. Tex. October 15, 2014)................   10


STATUTES                                                          PAGE

Rule 56(c), Federal Rules of Civil Procedure.............   8

42 U.S.C. § 12112(a)(2015)...............................   9

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| SUSAN STOCKTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 1:15-cv-333 |
| | § | (JURY) |
| CHRISTUS HEALTH SOUTHEAST | § | |
| TEXAS D/B/A CHRISTUS HOSPITAL | § | |
| ST. ELIZABETH, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

TO THE HONORABLE JUDGE MARCIA CRONE:

Plaintiff Susan Stockton ("Stockton") timely files this Response to Defendant's Motion for Summary Judgment and Objections to Summary Judgment Evidence as follows:

## NATURE AND STAGE OF THE PROCEEDINGS

1.   Defendant Christus Health Southeast Texas d/b/a Christus Hospital St. Elizabeth (the "Hospital") terminated Stockton's employment following a leave of absence caused by an on-the-job injury in violation of Stockton's rights under the Americans with Disabilities Act (the "ADA"), as amended.[1]  Now, at the close of discovery, both parties have moved for summary judgment.

## SUMMARY OF THE ARGUMENT

2.   Although Stockton's Motion for Partial Summary Judgment

---

[1]   Stockton also alleged violations of the Family Medical Leave Act and Section 510 of the Employee Retirement Income Security Act of 1974.  However, Stockton intends to proceed solely on her claims under the ADA.

("Stockton's Motion") is currently pending before the Court and is incorporated herein by reference, the Hospital filed a separate motion asserting that Stockton's claims should be dismissed primarily because: (i) Stockton was not a qualified individual with a disability and (ii) Stockton has no evidence that she was denied positions and/or terminated because of her disability.  As shown below, Stockton was a qualified individual who was subjected to adverse employment decisions on account of her disability in violation of the ADA.

<u>RESPONSE TO DEFENDANT'S FACTUAL ALLEGATIONS</u>

3.   In accordance with the Court's Standing Order MC-56, Stockton responds to the Defendant's asserted facts as follows:

1.   Undisputed.

2.   Undisputed.

3.   Undisputed.

4.   Undisputed but not material.

5.   Undisputed.

6.   Undisputed.

7.   Disputed, <u>see</u> Stockton Deposition, p. 68-69.

8.   Undisputed.

9.   Undisputed.

10.  Undisputed.

11.  Undisputed.

12.  Undisputed.

13.  Disputed, <u>see</u> Exhibit "D-10" and paragraph 26.

14.  Undisputed by context clarified in paragraph 9.

15.  Undisputed.

16.  Undisputed.

17.  Disputed, <u>see</u> Exhibit "D-23."

18.  Undisputed.

19.  Disputed, <u>see</u> paragraphs 26-28.

20.  Disputed, <u>see</u> Exhibit "D-23."

21.  Disputed, <u>See</u> paragraphs 54-56; Exhibit "A," pp. 18, 32, 34, 39-41, 54-55.

22.  Disputed, <u>See</u> Exhibit "A," pp. 18, 32, 34, 39-41, 54-55.

23.  Disputed, <u>See</u> paragraphs 54-56; Exhibit "A," pp. 18, 32, 34, 39-41, 54-55.

24.  Disputed, see paragraphs 15-18; Exhibit "A," p. 156; "D-18."

25.  Undisputed in context, see paragraph 17.

<u>PLAINTIFF'S MATERIAL FACTS</u>

4.  Stockton, a long time employee of the Hospital, fell at work fracturing her right humorous on April 14, 2014.  <u>See</u> Exhibit "A," Deposition of Susan Stockton, pp. 39-41, 69.  Stockton's injury and related benefits were governed by the Hospital's Occupational Injury Assistance Plan (the "Plan").  <u>See</u> Exhibit "A," pp. 71-72, 75.

5.  Stockton returned to work with restrictions after a three (3) month leave of absence, and in accordance with the terms of the Plan, was placed in a light duty position.  <u>See</u> Exhibit "A," pp.

81-82. However, Stockton was subject to termination at the expiration of a ninety (90) day period unless she was released from all restrictions or obtained a position within the Hospital that would accommodate her restrictions within that time frame. <u>See</u> Exhibit "A," pp. 83, 94-95.

6. Approximately midway through the ninety (90) day period, Stockton's treating physician requested an MRI of her shoulder so that he could make a determination regarding Stockton's release from restrictions. <u>See</u> Exhibit "A," p. 86. The Plan denied the request and instead referred Stockton for an independent medical examination ("IME"). <u>See</u> Exhibit "A," p. 86.

7. The examiner, without the benefit of additional testing, incorrectly concluded that Stockton's restrictions were permanent. <u>See</u> Exhibit "A," p. 89. Stockton was removed from her light duty position and given thirty (30) days to find a new position that would accommodate her restrictions or her employment would be terminated. <u>See</u> Exhibit "A," p. 95.

8. Stockton immediately informed the Hospital of her intent to appeal the results of the IME. <u>See</u> Exhibits "D-3," "D-12," and "D-24." Stockton believed that an MRI would result in a full release from her restrictions and her immediate return to work. <u>See</u> Exhibit "A," p. 95. Unfortunately, Stockton's appeal was delayed because her requests for a copy of the Plan were repeatedly denied until she contacted the Department of Labor. <u>See</u> Exhibits "D-2"

through "D-10."  It should be noted, however, that Stockton's appeal was ultimately successful in that the Plan's reviewing physician agreed with Stockton's full duty release.  <u>See</u> Exhibit "D-10."

9.   In the meantime, Stockton asked that she be allowed to continue in her light duty position pending the appeal.  <u>See</u> Exhibits "D-11" and  "D-12."  Stockton expressed her desire to continue working for the Hospital whether it was in her department or in another position.  <u>See</u> Exhibits "D-11" and "D-12."

10. Rather than engage in any meaningful dialogue with Stockton to explore the feasibility of her request for accommodation, including the timeline for her appeal, or the length of time that Stockton would remain on light duty, Stockton was simply told "we can't create a position for you" without further discussion.  <u>See</u> Exhibits "A," pp. 171-172 and "D-12."

11. As far as accommodation, the Hospital only advised Stockton of job postings that were accessible online.  <u>See</u> Exhibit "C," Deposition of Marsha Worthy, pp. 27-30.  In that regard, Stockton applied for numerous positions within the Hospital for which she was qualified, including:

```
Position:      RN (Quality Assurance)
Date Applied:  October 19, 2014

Position:      RN (Clinical Documentation Specialist)
Date Applied:  November 10, 2014

Position:      RN
Date Applied:  December 30, 2014

Position:      RN (Clinical Documentation Specialist)
```

```
Date Applied:   December 30, 2014

Position:       RN (Ambulatory Surgery)
Date Applied:   February 14, 2015

Position:       RN (OB/GYN)
Date Applied:   February 27, 2015

Position:       RN (Quality Management)
Date Applied:   February 27, 2015
```

See Exhibit "E," Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories.

12.  Without a job offer and facing termination, Stockton elected to have her previously scheduled back surgery on November 20, 2014.  See Exhibit "A," pp. 107-108.  While recovering from the back surgery, Stockton sought and received a second opinion on her shoulder on December 31, 2014.  See Exhibit "A," p. 111.

13.  Dr. Figari agreed with Stockton's prior treating physician noting that an MRI was necessary before any determination could be made regarding the permanency of Stockton's restrictions.  See Exhibit "D-23."  Contrary to the Hospital's assertions, Stockton's physician documented his expectation that Stockton would be able to return regular duty.  See Exhibit "D-23."

14.  On January 6, 2015, Stockton notified her manager, Dennis LeBlanc ("LeBlanc"), of her pending appeal and again requested that she be allowed to continue in her transitional duty role as a reasonable accommodation.  See Exhibit "D-15."  On January 9, 2015, Stockton provided LeBlanc a copy of her treating physician's records reflecting his disagreement with the IME's conclusions.  See Exhibit

"D-23." Stockton received <u>no</u> <u>response</u> to her request for accommodation. <u>See</u> Exhibit "B," Deposition of Dennis LeBlanc, pp. 64, 69.

15. On January 14, 2015, Stockton's treating physician released her to return to work without restrictions after reviewing an MRI that was paid for by Stockton personally. <u>See</u> Exhibit "A," p. 116 and "D-23." Stockton hand delivered the release to the Hospital's human resources department. <u>See</u> Exhibit "A," p. 125. Stockton subsequently emailed the release from her back surgeon to the Hospital on February 23, 2015. <u>See</u> Exhibit "A," p. 126.

16. Stockton was told that her position was no longer available. <u>See</u> Exhibit "A," p. 153; Exhibit "D-16." Stockton was once again given thirty (30) days to find another position or her employment would be terminated. <u>See</u> Exhibit "A," p. 156.

17. After thirty (30) days passed without a job offer, Stockton applied for unemployment benefits with the Texas Workforce Commission ("TWC"). <u>See</u> Exhibit "A," pp. 143, 145. In response, the Hospital represented to the TWC that Stockton was still employed.

18. Finding in Stockton's favor, the TWC concluded that Stockton had been fired because of her medically verifiable illness and that she was eligible for benefits. <u>See</u> Exhibit "A," p. 156; Exhibit "D-17." Shortly thereafter, Stockton found a part-time

position with a different hospital in April, 2015.[2]  See Exhibit "A," p. 29.

19.  Throughout this ordeal, Stockton contacted the Hospital's benefits resource center several times regarding the status of her benefits.  See Exhibit "A," p. 156; "D-18."  Although she had not worked for five (5) months, Stockton was assured that she remained an active employee with benefits.[3]  See Exhibit "A," p. 188.

20.  Consequently, when Stockton's husband of almost forty (40) years passed away unexpectedly on August 15, 2015, she filed a claim for benefits under the group life insurance policy maintained through the Hospital.  See Exhibit "A," p. 189.  After Stockton filed her claim for benefits, her employment was terminated in September of 2015, and deemed retroactively effective April 21, 2015.

21.  To sum up briefly, Stockton was injured on the job, denied an MRI that would have allowed her to return to work without restrictions, denied an opportunity to engage in an interactive process with the Hospital, refused a reasonable accommodation, and ultimately terminated because of her temporary restrictions.

SUMMARY JUDGMENT STANDARD

22.  Rule 56(c) of the Federal Rules of Civil Procedure

---

2    Stockton was not offered a full time position until January, 2016.

3    The Hospital also represented to the Equal Employment Opportunity Commission that Stockton remained employed as of April 21, 2015.  See Exhibit "D-19."

provides that summary judgment should be granted only if the pleadings, discovery products, and affidavits on file show that there are no genuine issues of material facts and that the moving party is entitled to summary judgment as a matter of law. Celotex Corp. V. Catrett, 477 U.S. 317, 326 (1986). In reviewing summary judgment motions, courts draw all reasonable inferences in favor of the nonmoving party and refrain from making credibility determinations or weighing the evidence. E.E.O.C. v. LHC Group, Inc., 773 F.3d 688, 693 (5th Cir. 2014). As such, summary judgment is only appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. LHC Group, Inc., 773 F.3d at 693. Applied here, the Hospital has failed to demonstrate its entitlement to summary judgment.

## ARGUMENT AND AUTHORITIES

23. The ADA prohibits an employer from discriminating against a qualified individual with a disability on the basis of the disability. 42 U.S.C. § 12112(a) (2015). To establish a prima facie case of discrimination under the ADA, Stockton, must prove: (i) that she had a disability; (ii) that she was qualified for the job; and (iii) that she was subject to an adverse employment decision on account of her disability. LHC Group, Inc., 773 F.3d at 696-697.

24. In its motion, the Hospital concedes that Stockton was disabled from April 14, 2014, through February 15, 2015, but argues

that Stockton cannot establish the two (2) remaining elements of her ADA claim.  Specifically, the Hospital incorrectly contends that Stockton was not a qualified individual or subjected to adverse employment decision on account of her disability.  As shown below, these assertions are without merit and do not entitle the Hospital to summary judgment.

    A. <u>Stockton was a Qualified Individual with a Disability</u>

25.   The determination of Stockton's qualification is two-fold: (i) whether Stockton meets the prerequisites for the job in terms of education, experience, and skills and (ii) whether Stockton can perform the essential job functions with or without reasonable accommodations.  <u>Wilkerson v. Boomerang Tube, LLC</u>, 2014 U.S. Dist. LEXIS 146695 (E.D. Tex. October 15, 2014).

26.   As a preliminary matter, the Hospital admits that Stockton is a good nurse who was qualified for each of the positions for which she was hired or applied.  <u>See</u> Exhibit "B," p. 26; Exhibit "C," p. 35.  Thus, the question before the Court is whether there is any evidence that Stockton could have performed the essential elements of her job with a reasonable accommodation.

27.   The Hospital argues that Stockton's "permanent" restrictions prevented her from lifting which is an essential job function for a bedside care nurse.  The Hospital further argues that the creation of a permanent light duty position was not a reasonable accommodation.  The Hospital's argument is fundamentally flawed.

28.   First, Stockton's restrictions were, in fact, <u>temporary</u>

and not permanent.  Secondly, Stockton was already in a light duty position.  As such, all that Stockton required was a limited extension of her already existing light duty position. Alternatively, Stockton could have been granted a limited extension of her leave of absence.  Either way, Stockton would have been able to return to work without restrictions with these reasonable accommodations.[4]

29.  Setting aside the fact that Stockton's restrictions could have been lifted before the light duty assignment expired if the MRI had been allowed, it is indisputable that Stockton was able to return to work without restrictions once the MRI was completed. Consequently, had Stockton been given a limited extension of her light duty position or leave of absence as a reasonable accommodation (to appeal the IME or otherwise obtain an MRI), she could have returned to work able to perform all essential functions of her job.

30.  This is especially true of Stockton's January 6th request for accommodation.  This request would have resulted in an accommodation lasting approximately two (2) weeks as Stockton's restrictions were lifted on January 14, 2015.  Consequently, granting Stockton a brief extension of her light duty position or

---

[4]    A limited extension of a medical leave or light duty may be a reasonable accommodation.  Villalon v. Del Mar College Dist., 2010 U.S. Dist. LEXIS 82766 at *23 (S.D. Tex. August 13, 2010); E.E.O.C. v. Chemtech, 1995 U.S. Dist. LEXIS 21878 at *4 (S.D. Tex. July 21, 1995); Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 967 (10th Cir. 2002); Cehrs v. Ne. Ohio Alzheimer's Research Center, 155 F.3d 775, 783 (6th Cir. 1998).

leave of absence as a reasonable accommodation would have allowed Stockton to return to work without restrictions and perform the essential functions of her position.

31.  In other words, Stockton was a qualified individual in that she could have performed the essential functions of her job with a reasonable accommodation, namely, an additional limited period of leave or light duty.  See Burress v. City of Franklin, 809 F.Supp.2d 795, 812 (M.D. Tenn. 2011).  For these reasons, the Hospital is not entitled to summary judgment.

### 1. Failure to Engage in Interactive Process

32.  As noted above, Stockton requested accommodations on October 22, 2014 (Exhibit "D-11"), November 7, 2014 (Exhibit "D-12"), and January 6, 2015 (Exhibit "D-15").  Once an employee presents a request for an accommodation, the employer is required to engage in an interactive process so that together they can determine what reasonable accommodations might be available.  LHC Grp., Inc., 773 F.3d at 699.  Here, it is undisputed that Stockton never had any meaningful dialogue with the Hospital which could have easily resulted in a reasonable accommodation.

33.  For example, had the Hospital engaged in an interactive process with Stockton in response to her October or November requests, Stockton could have returned to work at that time. Specifically, if Stockton had known that the Hospital would accept her treating physician's release in lieu of a formal appeal as it eventually did in February, 2016, Stockton could have scheduled the

MRI immediately. Stockton would have been able return to work without restrictions in a matter of days.

34. Had the Hospital engaged in an interactive process with Stockton in January, it would have been advised that Stockton's treating physician did not consider her restrictions permanent. The Hospital would have also learned that Stockton had an MRI scheduled which resulted in her release from restrictions a week later.

35. Briefly put, had the Hospital engaged in an interactive process with Stockton, a short term reasonable accommodation could have been agreed upon enabling Stockton to return to work without restrictions. Where, as here, an employer's unwillingness to engage in a good faith interactive process led to a failure to reasonably accommodate an employee, the employer has violated the ADA. Loulseged v. Akzo Nobel, Inc., 178 F.3d 731, 736 (5th Cir. 1999).

36. At a minimum, the availability of a reasonable accommodation (a brief extension of her light duty or leave) that would allow Stockton to return to work without restrictions and perform the essential functions of her job refutes the Hospital's assertion that Stockton was not a qualified individual precluding summary judgment.

B. Stockton Was Subjected to Adverse Employment
Decisions Because of Her Disability

37. The Hospital argues that Stockton cannot establish that she was subjected to adverse employment decisions because of her disability. This contention is legally unsupportable for a number

of reasons.

### 1. Stockton's OB/GYN Position

38. First, the Hospital openly admits that Stockton lost her job in October, 2014 on account of her disability. However, the Hospital argues that Stockton's claim must nevertheless fail because she was not a qualified individual at the time. Contrary to the Hospital's assertions, and for the reasons set forth above, Stockton could have performed the essential functions of her job with a reasonable accommodation. As a result, Stockton was a qualified individual and her termination in October violated the ADA.[5]

39. Stockton suffered a second adverse employment decision with respect to her former position in June, 2015. Stockton's unit coordinator, Charlotte Cunningham ("Cunningham"), submitted a requisition to specifically replace Stockton. See Exhibit "F," Deposition of Charlotte Cunningham, pp. 62-64; Exhibit "F-5" (Requisition). Although Cunningham knew that Stockton's restrictions had been lifted, she did not offer Stockton the opportunity to return to her former position. See Exhibit "F," pp. 62-64.

40. No one from the Hospital notified Stockton that her former position was open. Instead, the Hospital assumed that Stockton was no longer interested in the position. See Declaration of Marsha Worthy, Doc #21-1, pp. 81-86. As a result, Stockton was subjected to adverse employment decisions with respect to her own position on

---

5    See also the administrative finding by the TWC that Stockton was terminated because of her medically verifiable illness.  See Exhibit "D-17."

two (2) separate occasions.

## 2. Case Management Positions

41.   Three (3) of the seven (7) positions that Stockton applied for were in the case management department.[6]  Each of Stockton's applications were reviewed and considered by Gini Crawford ("Crawford"), the manager of the case management department.

42.   Crawford had several positions open in her department when Stockton was interviewed.  See Exhibits "D-13" and "D-14."  Although the Hospital admits that Stockton was qualified for the positions, none were offered to Stockton.   Crawford claims that she did not offer Stockton a position because she wanted someone with "acute care experience."

43.   Notably, Crawford agreed that acute care experience would include someone who has worked in surgery.   See Exhibit "G", Deposition of Gini Crawford, pp. 30-31.  Crawford also claimed that Stockton was not offered a position because she preferred someone with a variety of experience who had worked in the Hospital in various roles with different physicians and staff.  See Exhibit "G," p. 46.   The problem with Crawford's explanation is that Stockton fits that description precisely.

44.   At the time of her interview, Stockton had been employed with the Hospital in a variety of roles including, the

---

6    The Hospital suggests that Stockton was unfamiliar with the various job descriptions applicable to her applicantions.  In reality, Stockton reviewed the job descriptions when she applied and believed that she was qualified for the positions.  See Exhibit "A," pp. 136, 138, 139.

cardiovascular intensive care unit, the post anesthesia care unit, the interventional radiology unit, and the OB/GYN unit.  <u>See</u> Exhibit "A," pp. 39-41.   In other words, Stockton perfectly matched Crawford's stated preferences.

45.   Nevertheless, Stockton was not offered one of the several positions that remained open until February or March of 2015.  <u>See</u> Exhibit "G," pp. 43-44.   The most logical explanation for this adverse employment decision given Stockton's experience arises from Crawford's "concern" about Stockton's physical limitations.  <u>See</u> Exhibits "D-13" and "D-14."

46.   In that regard, Crawford exchanged emails with the human resources department in connection with Stockton's application.  For example, Crawford forwarded Stockton's email thanking Crawford for the interview to human resources.  <u>See</u> Exhibit "D-13."   In one such email, Crawford noted that Stockton "was very transparent about her injury" and stated "I have a concern with her physical limitations." <u>See</u> Exhibit "D-14."

47.   Given that Crawford's explanation for her rejection of Stockton is negated by the facts, namely Stockton's actual experience, coupled with Crawford's "concern" for Stockton's disability, there is ample evidence to support the conclusion that a discriminatory basis for Crawford's adverse employment decision exists.

### 3. <u>The Outpatient Pavillion</u>

48.   Stockton also applied for a position in the Outpatient

Pavilion ("OPP").   According to its website, the OPP provides outpatient surgery and imaging services.  The Hospital argues that Stockton's OB/GYN experience was too specialized for Stockton to qualify for this position.

49.   To the contrary, Stockton was highly qualified to work in perioperative settings such as the OPP.  See Exhibit "A," p. 32. Stockton worked with all types of surgical patients in the post anesthesia care unit for a number of years before transferring to the OB/GYN area.  See Exhibit "A," p. 34.  In fact, Stockton had an advanced certification in post anesthesia care from the Association of Perioperative Nurses. See Exhibit "A," pp. 18-19.

50.   As part of the OB/GYN unit, Stockton worked in pre-op, surgery, post anesthesia care, and the step down area where patients are discharged.  See Exhibit "A," pp. 54-55.  In the preoperative area, Stockton routinely reviewed lab results, started IVs, started antibiotics, and prepared the patient for surgery which were required tasks for every surgical procedure. See Exhibit "A," pp. 18-19.

51.   Stockton's advanced certification and experience in perioperative nursing made her extremely qualified to work in the OPP contrary to the Hospital's assertions.  Nevertheless, Stockton's application was rejected based on her "specialized" experience.

52.   To sum up briefly, Stockton was subjected to a number of adverse employment decisions on account of her disability.  For example, Stockton was excluded from her own position on two separate

occasions, at least one of which the Hospital admits was because of her disability.  Three additional positions for which Stockton was well suited were decided by a manager who had "concern" about Stockton's disability.  Finally, Stockton was rejected by the outpatient surgery department even though she had advanced certification and years of experience in perioperative nursing. Contrary to the Hospital's assertions, there is ample evidence to establish that Stockton was subjected to adverse employment decisions on account of her disability.  Consequently, the Hospital has failed to establish its entitlement to summary judgment as a matter of law.

<u>OBJECTIONS TO INADMISSIBLE EVIDENCE</u>

53.  In support of its motion, the Hospital provided declarations from Marsha Worthy, Dennis LeBlanc, Gini Crawford, and Charlotte Cunningham.  These declarations contain inadmissible hearsay and bald assertions of ultimate facts that are incompetent summary judgment evidence.

54.  Specifically, Stockton objects to the following bald assertions of ultimate facts contained within the Declaration of Marsha Worthy as constituting no evidence for purposes of summary judgment.  <u>See</u> <u>Gossett v. Du-Ra-Kel Corp.</u>, 569 F.2d 869, 872 (5th Cir. 1978); <u>Contreras v. United States Bank Nat'l Ass'n</u>, 2015 U.S. Dist. LEXIS 11551 at *2 (S.D. Tex. February 2, 2015).

> St. Elizabeth does not discriminate against its employees
> on the basis of disability or the exercise of any legal
> rights, including but not limited to the Americans with

> Disabilities Act, as amended; the Family and Medical Leave Act; or employees' rights to receive benefits through any CHRISTUS benefits plan.

> St. Elizabeth recognizes and embraces an affirmative obligation to work interactively, on an individualized basis, with all employees who may be disabled, to determine whether a reasonable accommodation may enable such employees to perform the essential functions of their jobs.

> I would have reached the same conclusion as to any similarly-situated employee, regardless of whether or not that employee was or had ever been disabled.

55. Unsupported allegations, self serving conclusions and assertions of ultimate facts are incompetent summary judgment evidence. Galindo v. Precision Am. Corp., 754 F.2d 1212, 1216 (5th Cir. 1985). Thus, Stockton asks the Court to strike the above statements from the summary judgment record.

56. Additionally, Stockton objects to the following statements in Marsha Worthy's declaration as inadmissible hearsay.

> Ms. Munoz reminded me that one registered nurse ("RN") in the Department was already on FMLA leave and that another nurse (Katie Steward) had requested to take FMLA leave during approximately the same time that Ms. Stockton was seeking leave.

> It is my understanding that Ms. Stockton's claim was denied pursuant to the terms of the life insurance plan. I understand that Ms. Crawford and Mr. Doyle were looking for (and indeed hired) applicants who they believed had more relevant knowledge and experience than Ms. Stockton had. The applicants who were selected were already acquainted with the physicians, medical protocols, staff, and the specific tasks to be performed in these jobs. I understand that Ms. Crawford and Ms. [sic] Doyle viewed Ms. Stocked [sic] as being minimally qualified for these positions,

at best.

I understand that another applicant with more applicable experience was hired for the OPP position. Specifically, the applicant who was selected had prior experience in the ambulatory surgery admissions process and the actual flow of patients prior to having outpatient surgery.

In sum, based upon my review of each of these hiring decisions, including my communication with the hiring manager, I understand that the hiring manager selected an applicant whose experience, knowledge and skills matched the position's requirements better than Ms. Stockton's qualifications.

57. Repeating the statements of others to prove the truth of the matter asserted is hearsay. United States ex rel. King v. Solvay, S.A., 2015 U.S. Dist. LEXIS 132286 at *10 (S.D. Tex. September 30, 2015). In this case, Worthy has no personal knowledge regarding these matters other than what others, such as the hiring managers, told her. In fact, Worthy testified in her deposition that questions regarding the qualifications of job applicants would be best answered by the hiring managers. See Exhibit "C," p. 106.

58. Stockton objects to these statements as inadmissible both as hearsay and as lacking foundation or personal knowledge. Stockton requests that the Court strike such statements from the summary judgment record.

59. Finally, Stockton objects to the following statements relied upon by the Hospital to support summary judgment. Specifically, Stockton objects to the following assertions of

ultimate fact.

> St. Elizabeth does not discriminate against its employees on the basis of disability or the exercise of any legal rights. When I have concerns or questions about the Americans with Disabilities Act or the Family and Medical Leave Act, I refer to Marsha Worthy or someone else in Human Resources ("HR"). <u>See</u> Declaration of Dennis LeBlanc, Doc #21-1, pp. 115-116 and Doc #21-2, pp. 1-2.

> St. Elizabeth does not discriminate against its employees on the basis of disability or the exercise of any legal rights. When I have concerns or questions about the Americans with Disabilities Act or the Family and Medical Leave Act, I consult Dennis LeBlanc, Marsha Worthy or someone else in Human Resources ("HR"). <u>See</u> Declaration of Charlotte Cunningham, Doc #21-2, pp. 8-11.

> St. Elizabeth does not discriminate against its employees on the basis of disability or the exercise of any legal rights. <u>See</u> Declaration of Charlotte Cunningham, Doc #21-2, pp. 8-11.

> In my experience, St. Elizabeth does not discriminate against employees or applicants on the basis of disability. <u>See</u> Declaration of Gini Crawford, Doc #21-5, pp. 10-11.

> Ms. Stockton's medical or physical circumstances has absolutely nothing to do with my consideration of her qualifications as an applicant for a job in my department. See Declaration of Gini Crawford, Doc #21-5, pp. 10-11.

> If she had been the best-qualified applicant, I would have offered her a job and would have worked with her to provide whatever reasonable accommodation that she needed, as I indicated during my deposition on August 30, 2016. <u>See</u> Declaration of Gini Crawford, Doc #21-5, pp. 10-11.

60. Briefly put, Stockton asks the Court to strike each of the above statements as incompetent summary judgment evidence.

<u>CONCLUSION</u>

61.  Stockton has produced ample evidence to demonstrate that she was a qualified individual with a disability. Additionally, Stockton has produced sufficient evidence to support the conclusion that she was subjected to adverse employment decisions on account of her disability.  Finally, Stockton has established that the Hospital failed to engage in an interactive process which would have led to a reasonable accommodation.  For these reasons, Stockton respectfully requests that the Court deny the Hospital's Motion for Summary Judgment.

Respectfully submitted,


/S/ Mark Siurek
Mark Siurek
TBA# 18447900
Federal ID# 9417
3334 Richmond Avenue, Suite 100
Houston, Texas  77098
713-522-0066 (telephone)
713-522-9977 (fax)
msiurek@warrensiurek.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

WARREN & SIUREK, L.L.P.
Patricia Haylon
TBA# 09281925
Federal ID# 13941
3334 Richmond Avenue, Suite 100
Houston, Texas 77098
713-522-0066 (telephone)
713-522-9977 (fax)
thaylon@warrensiurek.com

-22-

CERTIFICATE OF DELIVERY

I hereby certify that, in addition to service automatically accomplished through the Notice of Electronic Filing, a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment and Objections to Summary Judgment Evidence was sent to the following by fax and/or by email on November 16, 2016, properly addressed as follows:


A. Kevin Troutman (ktroutman@laborlawyers.com)
Mauro Ramirez (mramirez@laborlawyers.com)
Fisher & Phillips L.L.P.
333 Clay, Suite 4000
Houston, Texas  77002
713-292-0151 (fax)


                    /S/ Mark Siurek
                    Mark Siurek