| | | |
|---|---|---|
| SUSAN STOCKTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:15-CV-333 |
| | § | |
| CHRISTUS HEALTH SOUTHEAST | § | |
| TEXAS *d/b/a* CHRISTUS HOSPITAL | § | |
| ST. ELIZABETH, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Susan Stockton's ("Stockton") Motion for Partial Summary Judgment (#20) and Defendant Christus Health Southeast Texas's ("Christus") Motion for Summary Judgment (#21). Having considered the pending motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment in favor of Christus is warranted.

I.  Background

Christus is a not-for-profit healthcare system with several facilities in southeast Texas. One such facility is Christus Hospital St. Elizabeth ("St. Elizabeth" or "the Hospital"), an acute care and trauma center located in Beaumont. Stockton, a registered nurse ("RN"), began working at the Hospital in 1996. She remained employed by the Hospital for 18 years during which time she served in various departments. Most recently, Stockton worked as an RN in the Hospital's OB-GYN Surgery Department ("the Department"). The Department is a specialized unit in which female patients undergo particularized obstetrical and/or gynecological surgical procedures, including emergency cesarian-section procedures. Other departments in which she worked

include the cardiovascular intensive care unit, the general post-anesthesia care unit, and the radiology department.[1]

Stockton has degenerative stenosis, which caused her extreme back pain. As a consequence, she opted to have back surgery to treat her condition. On April 9, 2014, Stockton submitted a request for leave under the Family Medical Leave Act ("FMLA") for the surgery, which had been scheduled for April 22, 2016. To discuss this request, Brenda Munoz ("Munoz"), the Department's Manager of Surgery, and Human Resources Manager Martha Worthy ("Worthy") scheduled a meeting with Stockton for April 14, 2014. At that meeting, Munoz and Worthy informed Stockton that an RN in the Department was already on medical leave and that another RN, Katie Stewart ("Stewart"), had requested medical leave for the same time. Munoz and Worthy explained that they were asking both Stockton and Stewart if it was possible for either of them to reschedule her surgery in order to avoid having three RNs out at the same time. The meeting concluded without a resolution of the staffing issue.

Later that same day, while still at work, Stockton fell and injured her right shoulder. She was seen in the emergency room and diagnosed with a fractured humerus. Because of the severity of her injury, Stockton required immediate FMLA leave. Accordingly, she filed a claim for benefits under the Hospital's Occupational Injury Assistance Plan ("OIAP").[2] Stockton was on leave from April 14, 2014, through July 27, 2014. During that time frame, the Hospital held

---

[1] Stockton did not work as an RN in all of these departments. Specifically, Stockton started out as a certified nurse assistant in the cardiovascular intensive care unit. She remained in that position until she graduated in May 1997, when she transitioned into a graduate nurse position within the same department. In that capacity, she worked under an RN until she passed her board examination and became an RN herself.

[2] The OIAP is an employer-promulgated welfare benefit plan, which provided Stockton with wage replacement benefits while she was on FMLA leave.

Stockton's position open and divided the workload among other RNs. Thereafter, her treating physician, Dr. Marshall Hayes ("Dr. Hayes"), released her to return to work with several restrictions—namely, Stockton could not lift more than 10 pounds or reach overhead with her right upper extremity. On July 28, 2014, Stockton returned to work under a Transitional Duty Plan ("TDP"). The TDP included a "light duty" role, which restricted Stockton's duties to clerical tasks in the Department's pre-op area. Additionally, the TDP limited her work schedule to day shifts and weekdays.

The Hospital provided Stockton with detailed instructions regarding the TDP. Specifically, the TDP documents stated that her transitional light duty status was "temporary" and would "not exceed 90 calendar days from the effective date of [the] plan." Further, the paperwork notified Stockton that, at the end of the 90 days, she had to be able to either: (1) return to her regular duty; or (2) if she had been placed on permanent restrictions, perform the essential functions of her position with or without a reasonable accommodation. If she failed to comply with either requirement, Stockton was subject to termination.

While she was on light duty, physicians continued to evaluate Stockton's shoulder. Dr. Hayes conducted a follow-up exam and recommended an MRI of her shoulder. The Hospital, however, referred Stockton for an independent medical examination ("IME"). The IME was performed by Dr. Zvi Kalisky ("Dr. Kalisky") on September 16, 2014. On October 20, 2014, Dr. Kalisky issued a report finding that Stockton was permanently restricted from lifting more than 20 pounds and from reaching with her upper right extremity. Dr. Kalisky, thus, released Stockton to return to work with permanent restrictions. Stockton notified the Hospital that she would be seeking another medical opinion and intended to appeal Dr. Kalisky's determinations.

On or about October 28, 2014, when Stockton's TDP ended, she returned to work. Upon her return, Worthy advised Stockton that she could have an additional 30 days to look for a new position that would accommodate her restrictions. Stockton continued to work in her light duty role during this time. Additionally, Stockton applied and interviewed for several positions at the Hospital. Further, Stockton contacted Dennis LeBlanc ("LeBlanc"), Manager of the Department and her direct supervisor, requesting that he recommend her for another position at the Hospital or consider keeping her "with adjustments to [her] responsibilities." Unfortunately, Stockton was unable to secure another position during this 30-day period, and HR notified her that she could not continue to work in the Department.

On November 20, 2014, before her 30-day extension of light duty ended and shortly after she was interviewed for a new position, Stockton elected to have her previously scheduled back surgery. As a result of that surgery, she was unable to work for three months, or until February 2015. During that time, she obtained benefits through the Hospital's short-term disability plan. On January 6, 2015, Stockton again emailed LeBlanc and informed him that she was still pursuing an appeal of the IME results and asked him to consider "a modification of her job." LeBlanc never replied to this request. While recovering from her back surgery, Stockton also met with Dr. Shawn Figari ("Dr. Figari") to obtain a second opinion on her shoulder injury. Dr. Figari agreed with Dr. Hayes that an MRI was necessary before any determination could be made regarding her restrictions. Thus, on January 9, 2015, Stockton emailed LeBlanc a copy of Dr. Figari's report and asked for his advice on the matter.

Stockton then personally paid for the MRI.[3]  On January 14, 2015, after reviewing the MRI, Dr. Figari drafted a new report opining that Stockton did "not have any permanent restrictions in her job requirements" due to her shoulder injury and released her to work "full duty with no restrictions."  Stockton hand-delivered this report to the Human Resources Department. Approximately one month later, Stockton emailed LeBlanc and inquired whether her position in the Department was still available.  LeBlanc responded that there were no positions available in the Department.  On February 23, 2015, Stockton was medically released with no restrictions in connection with her back surgery.  Because there were no positions in the Department, however, Stockton was again given 30 days to secure another position.  Stockton subsequently applied for two positions, but she was not offered either job.  Notably, Stockton did not apply for any other positions at the Hospital after February 2015, even though her former position became available again in June 2015.

At the conclusion of the second 30-day extension, Stockton applied for unemployment benefits with the Texas Workforce Commission ("TWC").  Although Christus maintained that Stockton was still employed by the Hospital, the TWC found that she had been terminated and was eligible for benefits.  Thus, Stockton received unemployment benefits until she accepted a part-time RN position in the post-anesthesia unit of The Medical Center of Southeast Texas, in Port Arthur, Texas, in April 2015.

On April 17, 2015, Stockton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Then, on August 15, 2015, Stockton's husband passed away.  Stockton subsequently filed a claim for benefits under the group life insurance policy

_____

[3] After a successful appeal, Christus reimbursed Stockton for the costs associated with the MRI.

maintained through the Hospital, even though she considered herself terminated by the Hospital and was working in a new position at another hospital. Therefore, instead of paying Stockton's claim, the Hospital retroactively terminated Stockton's employment, effective April 21, 2015.

On August 27, 2015, Stockton filed her original complaint, asserting claims under the FMLA and the Employee Retirement Income Security Act ("ERISA"). On November 20, 2015, Stockton amended her complaint to include a claim under the Americans with Disabilities Act ("ADA"). Essentially, Stockton alleges that, by terminating her employment, the Hospital discriminated against her based on a disability and retaliated against her for taking medical leave. On October 21, 2016, Stockton filed the instant motion, seeking partial summary judgment on her ADA claims. Then, on November 21, 2016, Christus filed its cross-motion for summary judgment, in which it contends that it is entitled to judgment as a matter of law on all claims asserted by Stockton.

II.  Analysis

A.  Evidentiary Objections

As an initial matter, Stockton objects to several portions of Christus's summary judgment evidence. Specifically, Stockton objects that the witness declarations offered in support of Christus's motion contain inadmissible hearsay and bald assertions of ultimate facts. Evidence offered for or against summary judgment is subject to the same standards and rules that govern the admissibility of evidence at trial. *Reeves v. Wells Fargo Home Mortg.*, 544 F. App'x 564, 569 (5th Cir. 2013) (citing *Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992)); *Okpala v. City of Houston*, 397 F. App'x 50, 55 n.15 (5th Cir. 2010); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387-88 (5th Cir. 2009).

Stockton first objects that Worthy's declaration contains hearsay. "Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial." *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995); *see Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001); *Garcia v. Reeves Cty.*, 32 F.3d 200, 203 (5th Cir. 1994). In her declaration, while explaining why she and Munoz had a meeting with Stockton, Worthy states that Munoz reminded her that another RN was already on FMLA leave and Stewart had requested to take FMLA leave at the same time that Stockton was seeking to take leave for her back surgery. This statement, however, is not offered for the truth of the matter asserted, but is offered to provide context. Whether the two nurses were taking FMLA leave or not is of no consequence to this action, as that had nothing to do with Stockton's subsequent shoulder injury or her termination. Rather, the statement merely explains why Worthy and Munoz were meeting with Stockton. Thus, this objection is OVERRULED.

Stockton also objects to the portions of Worthy's declaration in which Worthy explains the hiring process for the positions for which Stockton applied. Worthy explains what her understanding was, based upon her review of the hiring decisions made in her capacity as Human Resources Manager, as to the qualifications required for the positions and the qualifications of those ultimately hired. These portions, however, contain no identifiable out-of-court statements. Accordingly, Stockton's objections are OVERRULED. Stockton also objects that these portions of Worthy's declaration are not based on personal knowledge. The court disagrees. Worthy's statements as to the job qualifications are based on her role as a Human Resources Manager. *See Keller v. Coastal Bend Coll.*, 629 F. App'x 596, 599 & n.2 (5th Cir. 2015); *DIRECTV, Inc. v.*

*Budden*, 420 F.3d 521, 529-30 (5th Cir. 2005) (stating that knowledge of this type is within the "sphere of responsibility" of a management position). Indeed, Worthy remained involved during Stockton's search for a new position. Further, Worthy was familiar with Stockton's qualifications and work history. Therefore, this objection is also OVERRULED.

Finally, Stockton objects that the declarations of Worthy, LeBlanc, Charlotte Cunningham ("Cunningham"), and Ginni Crawford ("Crawford") contain assertions of ultimate fact. The relevant portions of these declarations contain statements along the lines of "St. Elizabeth does not discriminate against its employees on the basis of disability" and discuss St. Elizabeth's alleged compliance with anti-discrimination statutes. Christus responds that these statements "are provided for background purposes and are not cited in Defendant's Motion." Therefore, the court will not consider these statements for purposes of summary judgment. *See Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) ("[A]ffidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."); *accord Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 920 (5th Cir. 2009); *In re Segerstrom*, 247 F.3d 218, 227 (5th Cir. 2001). Thus, Stockton's objection is SUSTAINED.

B.    Summary Judgment Standard

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party. *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 794 (5th Cir. 2010); *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009). Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2804 (2015); *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012).

"A fact issue is material if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016); *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier*, 743 F.3d at 1007 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 334 (5th Cir. 2008) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001)). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771 (quoting *Anderson*, 477 U.S. at 248); *Tiblier*, 743 F.3d at 1007; *accord Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013).

Where "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all*

of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Access Mediquip L.L.C. v. United Healthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 1467 (2013); *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). Further, on cross-motions for summary judgment, the court examines each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005), *cert. denied*, 546 U.S. 1091 (2006); *accord Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014); *CareFlite v. Office & Prof'l Emps. Int'l Union, AFL-CIO*, 612 F.3d 314, 318 (5th Cir. 2010); *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013). The court must "review the record 'taken as a whole.'" *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))); *see City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Tiblier*, 743 F.3d at 1007; *see Hefren*, 820 F.3d

at 771.  The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in favor of the nonmovant.  *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014) (citing *Anderson*, 477 U.S. at 255); *Hemphill*, 805 F.3d at 538; *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

Nevertheless, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence."  *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992), *cert. denied*, 523 U.S. 1094 (1998)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012).  "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted."  *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) (quoting *Eastman Kodak Co.*, 504 U.S. at 468-69); *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss.), *aff'd*, 293 F. App'x 273 (5th Cir. 2008).  "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill*, 805 F.3d at 538 (citing *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *accord Stauffer v. Gearhart*, 741 F.3d 574, 581 (5th Cir. 2014).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to the case on which the nonmovant bears the burden of proof at trial.  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Tiblier*, 743 F.3d at 1007; *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp.*, 626 F.3d at 793. In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir.), *cert. denied*, 555 U.S. 1012 (2008) (quoting *Celotex Corp.*, 477 U.S. at 322-23).

C.      Discrimination Under the ADA

The ADA is a federal anti-discrimination statute designed to remove barriers that prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability. *See* 42 U.S.C. §§ 12101-12113; 29 C.F.R. § 1630, App. Background; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1561 (2012); *Mason v. United Air Lines*, 274 F.3d 314, 316 (5th Cir. 2001); *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001); *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001). Title I of the Act, which covers employment discrimination, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 701 (2012); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 46 (2003); *Feist v. La. Dep't of Justice*, 730 F.3d 450, 452 (5th Cir. 2013); *Milton v. Tex. Dep't of Crim. Justice*, 707 F.3d 570, 572 (5th Cir. 2013); *Atkins v. Salazar*, 677 F.3d 667, 675 (5th Cir. 2011).

Employees asserting claims under Title I of the ADA are required to follow the procedures applicable to Title VII actions, including the timely filing of an EEOC charge. *See* 42 U.S.C. § 12117(a); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 285-86 (2002); *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1172 (9th Cir. 1999), *cert. denied*, 531 U.S. 1189 (2001); *Wagner v. Tex. A&M Univ.*, 939 F. Supp. 1297, 1309 (S.D. Tex. 1996). In this case, there is no dispute that Stockton properly exhausted her remedies before filing suit, including the filing of an EEOC charge. Thus, to recover on her claim of employment discrimination under the ADA, Stockton must prove that:

(1)     she has a "disability";

(2)     she is qualified for the position; and

(3)     she was subject to an adverse employment action because of her disability.

*Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 680 (5th Cir. 2013); *Gober v. Frankel Family Tr.*, 537 F. App'x 518, 520 (5th Cir. 2013); *Atkins*, 677 F.3d at 675 (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (per curiam)); *Balderrama v. Pride Indus., Inc.*, 963 F. Supp. 2d 646, 665-66 (W.D. Tex. 2013). If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Gowesky v. Singing River Hosp.*, 321 F.3d 503, 511 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003); *Aldrup*, 274 F.3d at 286; *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see Milton*, 707 F.3d at 573. Importantly, "the relevant time for assessing the existence of a disability is the time of the adverse employment action." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 618 (5th Cir. 2009) (citing *Samuels v. Kan. City Mo. Sch. Dist.*, 437 F. 3d 797, 802 (8th Cir. 2006); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001); *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000)). In this case, the relevant time frame can be divided into two periods: (1) the period during which Stockton was restricted from heavy lifting, between April 14, 2014, and February 23, 2015 ("the lifting restriction period");[4] and (2) the period after February 23, 2015 ("the post-restriction period"). Significantly, both parties assume that Stockton was, in fact, disabled during the lifting restriction period.[5] Thus, the issues before the court are whether Stockton: (1) was disabled

---

[4] Although Stockton's lifting restrictions were removed on January 14, 2015, based on her shoulder injury, she was unable to return to work until February 23, 2015, due to her back surgery. Thus, because she was still on medical leave and had not yet obtained a full medical release, the court assumes, with no evidence to the contrary, that Stockton was unable to lift until February 23, 2015.

[5] The court notes, however, that heavy lifting restrictions, like the one at issue in this case, do not generally constitute a "disability" for purposes of the ADA. *See, e.g., Tyler v. La-Z-Boy Corp.*, 506 F. App'x 265, 268 (5th Cir. 2013) (noting that circuit precedent forecloses a finding that a lifting restriction amounts to a disability); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998) (holding that evidence of a restriction on heavy lifting was insufficient for a reasonable jury to find a substantial limitation on a major life activity); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996); *Pedroza v. Autozone, Inc.*, 536 F. Supp. 2d 679, 693-94 (W.D. Tex. 2008) (holding that plaintiff's medical limitations on lifting and reaching were not substantial limitations on the major life activity of lifting); *Middleton v. Ball-Foster Glass Container Co.*, 139 F. Supp. 2d 782, 793 (N.D. Tex. 2001) ("In accordance with the law of this circuit, this Court finds that Plaintiff's lifting restriction does not significantly impair a major life activity under the ADA."). Nonetheless, because the parties do not dispute this issue and Stockton's claim fails under the remainder of the elements of a *prima facie* case, the court will assume, for purposes of summary judgment, that Stockton was "disabled" during the lifting restriction period.

during the post-restriction period; (2) was a qualified individual; and (3) suffered an adverse employment action.

           1.    <u>Stockton's Motion for Partial Summary Judgment</u>

      In her motion for partial summary judgment, Stockton contends that she is entitled to judgment as a matter of law on her claim for discrimination under the ADA. Specifically, Stockton maintains that she was a qualified individual with a disability.[6] Therefore, she argues, the Hospital discriminated against her by terminating her from her position and by not hiring her for the available positions for which she applied.

      On an ADA claim, it is Stockton's burden to prove that she was qualified. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 & n.14 (5th Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998)). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Neely v. PSEG Tex., Ltd.*, 735 F.3d 242, 245-46 (5th Cir. 2013); *Shirley*, 726 F.3d at 680. Importantly, "[w]hile the ADA focuses on eradicating barriers, the ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job." *Foreman*, 117 F.3d at 808 (citing 29 C.F.R. § 1630, App. Background); *see Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *Franklin v. City of Slidell*, 969 F. Supp. 2d 644, 655 (E.D. La. 2013); *Galvan v. City*

---

[6] In her motion, Stockton generally asserts that she was disabled without reference to the specific time periods. Christus does not address the issue of disability at all in its response. Stockton, however, bears the burden of proving that she was disabled at the time that she suffered any adverse employment action.

*of Bryan*, 367 F. Supp. 2d 1081, 1090 (S.D. Tex. 2004). "To the contrary, the ADA is intended

to enable disabled persons to compete in the work-place based on the same performance standards

and requirements that employers expect of persons who are not disabled." *Foreman*, 117 F.3d

at 808; *see Franklin*, 969 F. Supp. 2d at 655; *Galvan*, 367 F. Supp. 2d at 1090.

"The determination of qualification is two-fold: (1) whether the individual meets the

necessary prerequisites for the job, such as education, experience, skills, and the like; and (2)

whether the individual can perform the essential job functions, with or without reasonable

accommodation." *Foreman*, 117 F.3d at 810 n.14 (citing 42 U.S.C. § 12111(8); 29 C.F.R.

§ 1630.2(m)); *see Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir.), *cert.*

*denied*, 546 U.S. 1033 (2005). Therefore, to be considered a qualified individual, the plaintiff

must show that: (1) she can perform the essential functions of the job despite her disability; or

(2) if she is unable to perform the essential functions of the job, that a reasonable accommodation

by the employer would enable her to perform those functions. *See Crossley v. CSC Applied*

*Techs., L.L.C.*, 569 F. App'x 196, 198 (5th Cir. 2014) (citing *Turco*, 101 F.3d at 1093); *Gober*,

537 F. App'x at 520; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 749 (5th Cir. 1996).

The essential functions of a job are those that bear more than a marginal relationship to the

job at issue. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014); *Rogers*, 87 F.3d at

759; *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993), *cert. denied*, 511 U.S.

1011 (1994). In determining the essential functions of a position, "consideration shall be given

to the employer's judgment as to what functions of a job are essential, and if an employer has

prepared a written description before advertising or interviewing applicants for the job, this

description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1997).

> With regard to "reasonable accommodation," the ADA provides that the term may include:
>
> (A)  making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B)  job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); *see Feist*, 730 F.3d at 453. In addition to repeating the examples set forth in the statute, the regulations define the term "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 417 (2002); *Feist*, 730 F.3d at 453; *Chevron Phillips Chem. Co.*, 570 F.3d at 620-21. Courts interpreting the statute and regulations have held that "a reasonable accommodation is 'a method of accommodation that is reasonable in the run of cases.'" *Riel*, 99 F.3d at 683 (emphasis omitted) (quoting *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993), *cert. denied*, 511 U.S. 1030 (1994) (interpreting "reasonable accommodation" under the Rehabilitation Act)); *see Keith v. Cty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (quoting *Barth*, 2 F.3d 1180); *Windhauser v. Bd. of Supervisors for La. State Univ. & Agr. & Mech. Coll.*, 360 F. App'x 562, 567 (5th Cir. 2010) (quoting *Riel*, 99 F.3d at 683); *Medrano v. City of San Antonio*, 179 F. App'x 897, 901 (5th Cir. 2006) (citing *US Airways, Inc.*, 535 U.S. at 401).

"An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029 (1996)); *accord Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). The plaintiff is required to demonstrate, as part of her *prima facie* case, that an accommodation of her disability exists and that such accommodation is reasonable. *See Riel*, 99 F.3d at 683; *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)); *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 752 (N.D. Tex. 2014). After the plaintiff has suggested a reasonable accommodation, the burden shifts to the employer to "engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability.'" *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)); *see Griffin*, 661 F.3d at 224 (citing *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009)).

Moreover, the defendant has the burden of showing that the proposed accommodation is unreasonable, which "merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (5th Cir. 1995); *see Riel*, 99 F.3d at 681-82; *Wilburn v. Lucent Techs. Inc.*, No. Civ. A. 3:98-CV-2581-L, 2000 WL 1772670, at *5 (N.D. Tex. Nov. 30, 2000). In practice, the questions of whether an accommodation is reasonable and whether it creates an undue burden are almost identical. *See, e.g., U.S. Airways, Inc.*, 535 U.S. at 402 (noting that ordinary summary judgment principles reconcile reasonable accommodation and undue hardship);

*Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (finding that an accommodation is not reasonable if it either imposes "undue financial and administrative burdens" or requires a "fundamental alteration in the nature of [the] program"); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir.) (undue hardship exists if employer "incurs anything more than a *de minimis* cost"), *cert. denied*, 534 U.S. 952 (2001); *Riel*, 99 F.3d at 681 (the terms "reasonable accommodation" and "undue hardship" often go hand-in-hand); *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1080 (6th Cir. 1988) (an accommodation is not reasonable if it places an undue burden on the employer).

Here, with regard to her former position as an RN in the Department, Stockton generally claims that she was a qualified individual, but she fails to demonstrate how she meets this statutory element. Rather, she contends that she was qualified simply because her supervisor, LeBlanc, thought she was a good nurse. This, however, does not establish whether she could perform the essential functions of her position with or without a reasonable accommodation. Hence, Stockton has not met her burden. Conversely, Christus asserts that Stockton could not perform the essential functions of her position and that the accommodation that she requested was not reasonable as a matter of law.[7] Thus, at the very least, Christus has demonstrated that genuine issues of material fact exist with regard to whether Stockton was qualified for her position in the Department.

To prevail on summary judgment, Stockton may also demonstrate that she was qualified for the positions for which she applied and that she suffered adverse employment actions with

---

[7] Stockton discusses the issue of a reasonable accommodation in the context of her claim for failure to accommodate. Nonetheless, she refers to her requested accommodation as a "reasonable accommodation" in a conclusory manner. Stockton's argument focuses entirely on Christus's alleged failure to engage in an interactive process, presuming that her request was reasonable.

regard to such positions. Nevertheless, in her motion, Stockton merely speculates that "it is highly unlikely that [she] would not be the most qualified candidate" for these positions. Further, she concedes that she has "no evidence as to how and by whom those positions were filled." Rather, she suggests that she meets this prong of the test merely because a manager overseeing several of the open positions for which she applied "expressly raised concerns about Stockton's disability."[8] Stockton's speculative and conclusory statements do not constitute evidence that she was more qualified than the individuals who were offered the jobs. *See Allen v. Babcock & Wilcox Tech. Servs. Pantex, LLC*, No. 2:12-CV-00225-J, 2013 WL 5570192, at *8 (N.D. Tex. Oct. 9, 2013) (quoting *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996)) ("The ADA is not read as 'requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."). Accordingly, Stockton has not met her burden to establish beyond peradventure that she was a "qualified individual." Therefore, summary judgment in favor of Stockton is unwarranted.

### 2.    Christus's Cross-Motion for Summary Judgment

In its motion for summary judgment, Christus contends that Stockton's claim for discrimination under the ADA fails as a matter of law. Although Christus assumes that Stockton was disabled during the lifting restriction period, Christus contends that her claim nonetheless fails because she was not a "qualified individual." With regard to the post-restriction period, Christus

---

[8] The court notes that Crawford, who interviewed Stockton, wrote an email to Worthy in which she stated that she had "a concern with [Stockton's] physical limitations" because the job involved carrying computers. Thus, it seems that, at least in that instance, Stockton's physical limitations were considered in so far as they affected her ability to perform essential functions of the job for which she applied. This does not, however, establish that she was otherwise qualified for this position.

asserts that Stockton was no longer "disabled." Further, Christus maintains that Stockton was not subject to adverse employment decisions because of her disability.

        a.      <u>Was Stockton "Disabled" During the Post-Restriction Period?</u>

Christus maintains that Stockton was no longer disabled once her lifting restrictions were removed. Notably, in her response, Stockton does not address this issue. Although Stockton remained under medical restrictions related to her back surgery for a month after her lifting restrictions were removed, and presumably could not lift, she has not demonstrated that this rendered her disabled as contemplated by the ADA. Furthermore, there is nothing in the record to suggest that Stockton was otherwise disabled once she received a full medical release on February 23, 2015. Thus, for Stockton to survive summary judgment, there must be evidence in the record to suggest that she had a record of a disability or was regarded as disabled.

While the parties in this case assume that Stockton's heavy lifting restrictions constitute a "disability" under the ADA, Fifth Circuit precedent says otherwise.[9] Indeed, courts have repeatedly stated that limitations on heavy lifting alone are insufficient to constitute impairments that substantially limit a major life activity. *See, e.g., Tyler*, 506 F. App'x at 268; *Sherrod*, 132 F.3d at 1120; *Ray*, 85 F.3d at 229; *Pedroza*, 536 F. Supp. 2d at 693-94; *Middleton*, 139 F. Supp. 2d at 793. "Heavy lifting" is defined broadly in this circuit and encompasses anything from 5 to 45 pounds. *See, e.g., Tyler*, 506 F. App'x at 268 (restriction on lifting more than 20 pounds occasionally and 10 pounds frequently not a disability); *Sherrod*, 132 F.3d at 1120 (restriction on

---

[9] As stated previously, the court assumed, for purposes of summary judgment, that Stockton was "disabled" as defined under the ADA during the lifting restriction period solely because both parties conceded that issue. The parties did not concede that she was disabled during the post-restriction period, however. Therefore, the court will not assume that she was disabled during that time period and will instead analyze her claim under Fifth Circuit precedent.

lifting 45 pounds occasionally and 20 pounds frequently not a substantial limitation on a major life activity); *Ray*, 85 F.3d at 229 (disorder preventing plaintiff from lifting more than 5 to 10 pounds not a disability); *Pedroza*, 536 F. Supp. 2d at 693-94 (restriction on lifting more than 30 to 39 pounds did not meet the definition of substantial limitation on a major life activity); *Middleton*, 139 F. Supp. 2d at 793 (plaintiff who could not lift more than 25 pounds not disabled). This principle applies equally under the "record of" and "regarded as" prongs. *See Moody v. M.W. Kellogg Co.*, 176 F.3d 479, No. 98-20757, 1999 WL 153032, at *3 (5th Cir. 1999) (table op.).

"[I]n order to prevail on a claim for discrimination based on a record of an impairment, the plaintiff must show both that '(1) the plaintiff has a record or history of impairment; and (2) the impairment limits a major life activity." *Bennett v. Calabrian Chems. Corp.*, 324 F. Supp. 2d 815, 832 (E.D. Tex. 2004) (citing *Blanks v. Sw. Bell Commc'ns, Inc.*, 310 F.3d 398, 402 (5th Cir. 2002) (citing *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 615 (5th Cir. 2001))). Here, Stockton had a history of past injury; however, this alone does not amount to evidence of a "history of *disability*" or *impairment*. *Moody*, 1999 WL 153032, at *3 (emphasis in original). "Evidence of past discrete injuries is insufficient . . . . there is a difference between a temporary, particular injury (such as a back injury resulting from a fall) and a substantially limiting impairment." *Id*. Moreover, as explained above, her restrictions on heavy lifting do not constitute an impairment that limits a major life activity. *See Hinojosa v. Jostens Inc.*, 128 F. App'x 364, 367 (5th Cir. 2005). Thus, Stockton cannot establish that she was disabled under the "record of" prong.

Finally, the ADA "permits suits by plaintiffs who, though not actually disabled . . . are nonetheless regarded as having such an impairment." *Kemp v. Holder*, 610 F.3d 231, 237 (5th

Cir. 2010) (internal quotation marks omitted) (quoting *Gowesky*, 321 F.3d at 508). To show that she was "regarded as having a disability," a plaintiff must show that she has:

(1)     a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2)     a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3)     none of the impairments defined in [(1) or (2)] . . . but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l). Because Stockton was no longer impaired in any manner during the post-restriction period, only subsection three is at issue in this case. Under this subsection, the claimant must "establish that the impairment, if it existed as perceived, would be substantially limiting." *McInnis*, 207 F.3d at 281 (citing *Deas v. River W., L.P.*, 152 F.3d 471, 576 (5th Cir. 1998)); *accord Windly v. Hightower Oil Co.*, 91 F. App'x 330, 332 (5th Cir. 2004); *Cato v. First Fed. Cmty. Bank*, 668 F. Supp. 2d 933, 942-43 (E.D. Tex. 2009).

Here, Stockton relies on the fact that Crawford expressed concerns about Stockton's lifting restrictions. This concern, however, was expressed in an email dated November 19, 2014, during the lifting restriction period. Nevertheless, there is no indication that anyone at St. Elizabeth perceived that Stockton still had an impairment once she received a full medical clearance. In any event, even if some decisionmakers at the Hospital had lingering doubts about Stockton's ability to lift more than 20 pounds during the post-restriction period, the Fifth Circuit has consistently held that such belief is insufficient to support a disability claim under the ADA's "regarded as" prong. *Moody,* 1999 WL 153032, at *4 (citing *Sherrod*, 132 F.3d at 1119-20); *Ray*, 85 F.3d at 229. For example, in *Moody*, the Court held that "[b]ecause a limitation on heavy lifting is not a substantial limitation of a major life activity under the ADA, a perception that an employee has

a heavy lifting limitation cannot amount to a perception that the employee is disabled." 1999 WL 153032, at *4. In other words, although some decisionmakers at St. Elizabeth may have believed Stockton still had an impairment that prevented her from heavy lifting during the post-restriction period, this perception is not the same as regarding her as "disabled" because such impairment, no matter how real, does not substantially limit a major life activity as defined under the ADA.

Therefore, the court finds that there is no genuine issue of material fact regarding whether Stockton was disabled during the post-restriction period. In the alternative, as discussed below, even if Stockton was disabled during the post-restriction period, her claim nonetheless fails because she was not qualified for the positions for which she applied during that time and did not suffer any adverse employment actions with regard to any position for which she was qualified.

        b.      <u>Was Stockton a "Qualified Individual"?</u>

        i.      <u>Stockton's Position in the Department</u>

With respect to her position in the Department, Stockton contends that she suffered two separate adverse employment actions: (1) when she effectively lost her position in October 2014, which the Hospital concedes;[10] and (2) in June 2015, when she was not offered the opportunity to return to her former position although her restrictions had been lifted. Because she had previously held that position and lack of qualifications is not a listed cause for her termination, the court will assume that Stockton met the necessary prerequisites for the job. Thus, the relevant inquiry is whether Stockton could perform the essential functions of the position with or without a reasonable accommodation.

---

[10] Although Christus concedes that Stockton effectively lost her position in October 2014, it maintains that such adverse employment action was not based on her alleged disability.

Pursuant to the job description for the position, an RN in the Hospital's OB/GYN Surgery Unit must be able to: (1) use proper body mechanics while moving/lifting patients and objects; (2) lift/move up to 50 pounds; and (3) frequently lift and push patients on beds, stretchers, and in wheelchairs. Further, RNs in the Department are expected to "assist a patient in the case of a fall or . . . another emergent situation," which, of course, involves lifting and carrying. Hence, lifting and upper body mobility are "essential functions" of Stockton's former position. Stockton does not dispute this. Moreover, it is undisputed that after Stockton returned to work from her shoulder injury, she was restricted from lifting more than 10 pounds and that, pursuant to the IME, she was permanently restricted from lifting more than 20 pounds. Therefore, Stockton was unable to perform certain essential functions of her job during the lifting restriction period.

Stockton, however, maintains that she would have been able to perform her duties with a reasonable accommodation during this time period. First, Stockton suggests that Christus should have extended her leave of absence. Nevertheless, courts have consistently held that a request for a leave of absence is not a reasonable accommodation that would allow an individual with a disability to perform the essential functions of her position. *See Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012); *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996); *Molina v. DSI Renal, Inc.,* 840 F. Supp. 2d 984, 1002 (W.D. Tex. 2012).

Alternatively, Stockton contends that she could have performed her duties with an extension of her light duty. Christus responds that this proposed accommodation was unreasonable as a matter of law. As an initial matter, the court notes that Christus granted Stockton two additional 30-day extensions of her light duty. The record demonstrates that Stockton requested this accommodation numerous times. On October 22, 2014, Stockton emailed

25

LeBlanc suggesting that he keep her in the Department "with adjustments to [her] responsibilities." Later, on November 7, 2014, Stockton emailed LeBlanc asking if there was "any way at all that [she] could continue to work pre-op" while she appealed the decision that her restrictions were permanent. Thereafter, on January 6, 2015, Stockton sent a third email to LeBlanc in which she asked that he make a "modification" to her job by "making a change in [her] schedule." Specifically, she sought to work only day shifts Monday through Friday, thus avoiding nights and weekends as well as emergency and on-call shifts. She also requested to be assigned specifically to the pre-op area, rather than rotating, as usually required. Three days after this email, Stockton followed up with a fourth email to which she attached a report from Dr. Figari. In his report, Dr. Figari recommended that Stockton be allowed to continue working in a light duty capacity and suggested that this be reevaluated after an MRI of her shoulder.

Courts have held that, in some circumstances, an extension of medical leave or light duty can be a reasonable accommodation. *See, e.g., Villalon v. Del Mar Coll. Dist.*, No. C-09-252, 2010 WL 3221789, at *7 (S.D. Tex. Aug. 13, 2010). Nonetheless, the ADA "does not require an employer to transfer from the disabled employee any of the essential functions of [her] job" in order to make reasonable accommodation for her disability. *Miller v. Metrocare Servs.*, 809 F.3d 827, 831 & n.3 (5th Cir.), *cert. denied*, 136 S. Ct. 2463 (2016); *LHC Grp., Inc.*, 773 F.3d at 698; *Crossley*, 569 F. App'x at 200 (citing *Barber v. Nabors Drilling, U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997)); *Gober*, 537 F. App'x at 522. Further, an employer has no obligation to create a new "light duty" position for a disabled employee. *See Moreno v. Brownlee*, 85 F. App'x 23, 28 (5th Cir. 2004); *Turco*, 101 F.3d at 1094; *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998); *Foreman*, 117 F.3d at 809. Likewise, an employer is not obligated to implement an

accommodation that would "result in other employees having to work harder or longer." *Hammond v. Jacobs Field Servs.*, 499 F. App'x 377, 382 (5th Cir. 2012) (citing *Turco*, 101 F.3d at 1094); *see Kralik v. Durbin*, 130 F.3d 76, 79 (3d Cir. 1997); *Daugherty*, 56 F.3d at 700. Hence, the ADA does not require an employer to create a new position, eliminate essential functions of a job, or assign existing employees or hire new employees to perform abandoned essential functions of a position. *See Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011); *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 53 (5th Cir. 1997); *Turco*, 101 F.3d at 1094; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996); *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995); *see also* 29 C.F.R. pt. 1630, App. § 1630.2(o). Additionally, "reasonable accommodation does not require [an employer] to wait indefinitely for [an employee's] medical conditions to be corrected." *Rogers*, 87 F.3d at 760 (emphasis omitted) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)); *accord Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481-82 (5th Cir. 2016).

Here, Christus asserts that Stockton's requested accommodation was not reasonable because it "would have substantially limited her duties and eliminated essential functions that required lifting (effectively proposing the creation of a new job)." Further, Christus contends that Stockton's proposal amounted to a request to make her light duty assignment permanent and that such modification would have resulted in the transfer of essential functions of Stockton's job, thus creating more work for other employees and an undue burden for the Hospital.

With regard to the duration of the requested accommodation, Stockton responds that the "request would have resulted in an accommodation lasting approximately two weeks," as her restrictions were lifted shortly after her request on January 6, 2015. Nevertheless, while

Stockton's emails to LeBlanc state that she was appealing the permanent nature of her restrictions, they do not contain any indication when the appeal would be decided or that the determination would be favorable to her. Rather, the notion that the restrictions would be lifted shortly was mere speculation and hope by Stockton at that point.[11] Thus, at the very least, Stockton's proposal amounted to a request for an indefinite extension of her light duty, which is not a reasonable accommodation. *Rogers*, 87 F.3d at 760.

Additionally, the evidence demonstrates that Stockton's request would have resulted in the transfer of essential functions of her position, thus creating more work for other RNs in the Department. Generally, RNs in the Department are expected to rotate through shifts, including day and night shifts, weekdays and weekends, emergencies and on-call shifts. Further, RNs rotate through the following areas within the Department: pre-op, surgery, post-anesthesia care, and the step-down area where patients are discharged.

In stark contrast to these requirements, Stockton's proposal was that she: (1) work only day shifts; (2) work only on weekdays; (3) avoid on-call shifts; and (4) work only in the pre-op area. If Stockton had been granted this modification, the remainder of the RNs in the Department would have had to work more night and weekend shifts. Likewise, the other RNs would have had to take on more on-call and emergency shifts and cover Stockton's rotations in three out of four areas of the Department. Perhaps more importantly, this accommodation would not have enabled

---

[11] The court notes that the modification would have, in fact, been temporary in nature. Even so, this is only apparent with the benefit of hindsight. At the time that Stockton made these requests, the Hospital had no reason to believe that her restrictions were anything but permanent and, thus, the modification to her job duties would also be permanent. Moreover, although her lifting restrictions were indeed lifted a couple of weeks later, Stockton was still on medical restrictions due to her back surgery for six weeks after that email. Further, Stockton continued to make this request for approximately three months. Hence, the modification would have lasted much longer than the two weeks she claims.

Stockton to perform the essential functions of her position, as she still would have been unable to lift more than 20 pounds for the foreseeable future. Thus, the Hospital would have had to ensure that another RN was always working with Stockton in case an emergency that required lifting arose, such as a patient fall.[12] Consequently, other RNs would have to make up for Stockton's shortcomings in the workplace.

Accordingly, the court finds that Stockton's requested accommodation was unreasonable as a matter of law and would have caused the Hospital to suffer undue hardship. Thus, Stockton was not a qualified individual with respect to her position in the Department during the lifting restriction period. Conversely, Stockton was qualified for this position once she received a full medical release. During the post-restriction period, Stockton was no longer impaired and, therefore, could have performed the essential functions of the position without the need for an accommodation. Stockton, however, has not met her burden of establishing that she was a qualified individual with a disability during the post-restriction period.

ii.     Positions Sought During the Lifting Restriction Period

Stockton also claims that she was a qualified individual with regard to the alternative positions for which she applied within the Hospital. Significantly, Stockton does not claim that she needed accommodations to perform the essential functions of these positions. Instead, the issue is whether Stockton met the necessary prerequisites for the jobs. Christus contends that Stockton was not hired for any other position because she was not the most qualified applicant for any of these positions. Stockton applied for five positions during the lifting restriction period.

_____

[12] The court also notes that Stockton's inability to lift could have compromised patient safety, as she would have been unable to respond to an emergency on her own.

Notably, courts generally defer to an employer's judgment calls regarding who is more qualified for a position. *See, e.g., Mills v. City of Port Arthur*, No. 1:05-CV-298, 2006 WL 3531460, at *20 (E.D. Tex. Dec. 4, 2006) ("It is well established that the employment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of employment decisions nor . . . to transform the courts into personnel managers.'"). Indeed, there is no requirement that disabled persons be given priority in hiring over more qualified, non-disabled individuals. *Daugherty*, 56 F.3d at 700. Rather, for a plaintiff to succeed, she must show that she was "clearly better qualified," as opposed to merely better qualified or as qualified as the employees who were selected for the position. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004); *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002); *Scott v. Univ. of Miss.*, 148 F.3d 493, 508 (5th Cir. 1998); *Udoewa v. Plus4 Credit Union*, 754 F. Supp. 2d 850, 870 (S.D. Tex. 2010). In order to defeat summary judgment, the difference in qualifications must be "so apparent as virtually to jump off the page and slap you in the face." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006); *Shakir v. Prairie View A & M Univ.*, 178 F. App'x 361, 364 (5th Cir. 2006); *Scott*, 148 F.3d at 508-09. In essence, "the losing candidate's qualifications must 'leap from the record and cry out to all who would listen that [she] was vastly—or even clearly—more qualified for the subject job.'" *Price*, 283 F.3d at 723 (quoting *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993)).

Moreover, the evidence of superior qualifications must be more than merely subjective and speculative. *Scott*, 148 F.3d at 508; *Martinez v. Webb Cty.*, No. L-07-110, 2009 WL 565507, at *6 (S.D. Tex. 2009); *Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 849, 878 (S.D. Tex. 2007) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 93 (5th Cir. 1991)). "To

establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for [her] opinion; mere subjective speculation will not suffice." *Scott*, 148 F.3d at 508 (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)).

Stockton applied for three positions in the Hospital's Case Management Department. According to Crawford, the head of the Case Management Department, the positions in her department required five years of acute care experience, with case management experience preferred.[13] At deposition, Crawford acknowledged that Stockton met the minimal requirements for the job, as her time in the Department qualified as acute care experience. Crawford also stated, however, that she was looking for someone with more varied experience "other than just working in a specialized area." Stockton contends that she was, in fact, experienced in a variety of settings, but she does not compare her qualifications to the persons who were ultimately hired. In contrast, during her deposition, Crawford testified that she hired another St. Elizabeth employee who had about 26 years of experience as a nurse.[14] Stockton, however, had less than 18 years of experience as an RN.

During this time period, Stockton also applied for a Surgical Care Improvement Project nurse position in the Quality Management Department. According to Christus, this position required familiarity with the Hospital's quality improvement process and experience in patient care documentation and data analysis, which Stockton lacked. Stockton does not refute this.

---

[13] Acute care experience refers to working in an acute care setting, which is typically a hospital.

[14] Unfortunately, the record does not contain any evidence of the credentials of the other two persons hired for these positions.

Finally, Stockton applied for a position in the Hospital's Outpatient Pavilion ("OPP"), a department that provides outpatient surgery and imaging services. Christus asserts that Stockton's experience in the Department was too specialized for her to qualify for this position but does not elaborate further. In response, Stockton maintains that she was highly qualified for this position because she had worked with all types of surgical patients in the post-anesthesia care unit prior to transferring to the OB/GYN area. She does not, however, specify how recent this experience was or how it is precisely related to the OPP position. Furthermore, as with the other positions, Stockton fails to demonstrate that she was better qualified compared to the other applicants.

iii.    <u>Positions Applied For During the Post-Restriction Period</u>

Once she was medically released, Stockton applied for a nursing position in the Labor & Delivery ("L&D") Department. According to Christus, because most of Stockton's experience was in the surgery unit, she had little experience caring for patients who are in active labor, which is a core requirement of nurses in L&D. Instead, the Hospital hired a nurse who had successfully completed an L&D preceptorship. Again, Stockton offers no comparable qualifications.

The last job for which Stockton applied was a third position in the Hospital's Quality Management Department. As explained above, however, Stockton lacked the necessary prerequisites for this position. Therefore, the summary judgment evidence demonstrates that Stockton has not shown that she was the most qualified applicant for any of the alternative positions for which she applied.

c.   Did Stockton Suffer an Adverse Employment Action Because of Her Disability?

Under the ADA, adverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *Chevron Philips Chem. Co.*, 570 F.3d at 622 (listing "the hiring, advancement, or discharge of employees"); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996). Further, the plaintiff must prove that an adverse employment decision was made "solely because of [her] disability." *Gonzales v. City of New Braunfels*, 176 F.3d 864, 836 (5th Cir. 1999); *see McInnis*, 207 F.3d at 282; *Still*, 120 F.3d at 51-52. The ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to report to work regularly or to perform essential job duties as a result of an injury or illness. *See Hypes on Behalf of Hypes v. First Commerce Corp.*, 134 F.3d 721, 726-27 (5th Cir. 1998) (citing 42 U.S.C. § 12112(a)); *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195-96 (7th Cir. 1998); *Rogers*, 87 F.3d at 759-60.

The only position for which Stockton has demonstrated that she was qualified under the ADA is her former position in the Department, and only during the post-restriction period. Stockton complains that "although Cunningham knew that Stockton's restrictions had been lifted, she did not offer Stockton the opportunity to return to her former position." Further, Stockton maintains that no one from the Hospital notified her that her former position became available in June 2015.[15] According to Stockton, this failure to notify her of the position and offer it to her constitutes an adverse employment action. A failure to offer a position, however, is not an

---

[15] At that time, Stockton had already represented to the TWC and the EEOC that she had been terminated from the Hospital, she had received unemployment benefits, and she had accepted a position and was working at another hospital.

33

adverse employment action under these circumstances. *See Gowesky*, 321 F.3d at 511. Significantly, Stockton has not proffered any case law to the contrary. Although Stockton was not notified of this position, there is no evidence that she had recently expressed interest in returning to work for the Hospital. Further, she did not apply for this position, and there is nothing to suggest that she did not have the ability to search for and find this job posting on her own.

Moreover, Stockton fails to demonstrate that the Hospital's decision not to notify her that the position had become available was due solely to a disability. Rather, she relies on the notion that the decisionmakers at the Hospital "assumed that Stockton was no longer interested in the position." Even if the decisionmakers at St. Elizabeth incorrectly assumed that Stockton was not interested, this would not support the view that she was not notified of the open position "solely because of her disability." Therefore, Stockton has failed to raise a genuine issue of material fact with regard to whether she suffered an adverse employment action because of her disability. Consequently, Christus is entitled to summary judgment on Stockton's ADA discrimination claim.

>    D.    Failure to Accommodate Under the ADA

Both parties also moved for summary judgment on Stockton's claim for failure to accommodate under the ADA. To prevail on a failure to accommodate claim, a plaintiff must prove the following elements: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist*, 730 F.3d at 452. Here, "reasonable accommodation" applies only to Stockton's position as an RN in the Department, and only during the lifting restriction period.

As explained above, there are no genuine issues of material fact regarding whether Stockton was a "qualified individual" or whether there was a "reasonable accommodation" that would have enabled her to perform the essential functions of her job. The law is clear that "an employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [her] job with an accommodation." *Jones v. Walgreen Co.*, 679 F.3d 9, 19 (1st Cir. 2012) (quoting *DeCaro v. Hasbro, Inc.*, 580 F.3d 55, 63 (1st Cir. 2009); *accord Wilkerson v. Boomerang Tube, LLC*, No. 1:12-CV-198, 2014 WL 5282242, at *10 (E.D. Tex. Oct. 15, 2014); *see Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 548-49 (N.D. Tex. 2010). Stockton does not suggest any accommodation that would have enabled her to perform the essential functions of her job, claiming instead that her light duty or leave of absence should have been extended, which, as detailed above, is not reasonable as a matter of law. Moreover, these accommodations, even if allowed, would not have enabled her to perform the essential functions of her RN position, such as lifting.[16] Thus, Stockton has also failed to meet her burden on her failure to accommodate claim. Accordingly, summary judgment in favor of Christus is warranted.

---

[16] Stockton asserts that had the Hospital engaged in an interactive process, it would have learned that Stockton was still seeking to get an MRI, which would have resulted in Stockton's scheduling the MRI sooner. Thereafter, Stockton contends, she would have been released to return to work without restrictions in a matter of days. Then, Stockton would have been able to perform the essential functions of her position. Not only are these assertions huge logical leaps, but they relate to Stockton's ability to perform her functions in the future. Significantly, "the term 'qualified individual with a disability,' as used in the ADA, does not refer to an employee's future ability to perform the essential functions of [her] position. Instead, the provisions of the ADA are 'formulated entirely in the present sense, framing the precise issue as whether an individual "can" (not "will be able to") perform the job with reasonable accommodation.'" *Ellis v. Shannon Med. Ctr.*, No. Civ. A. 6:01-CV-091-C, 2002 WL 31947822, at *4 (N.D. Tex. Oct. 25, 2002) (citing *Myers*, 50 F.3d at 283).

E.    Retaliation Under the FMLA and ERISA

In her complaint, Stockton alleges that she would not have been discharged if she had not taken a medical leave.  Thus, she contends, Christus violated the FMLA by retaliating against her because it did not:  (1) return her to her former position once she returned from FMLA leave; or (2) place her in another position that would accommodate her restrictions or for which she was qualified.  In its motion, Christus asserts that Stockton's claim under the FMLA fails because there is no competent summary judgment evidence that she was discharged for seeking or using FMLA leave.  To the contrary, Christus maintains, Stockton received the FMLA leave to which she was entitled.  Further, almost a year elapsed between Stockton's FMLA leave and her termination.

Additionally, Stockton asserts that Christus's aforementioned alleged failures also constituted retaliation for her filing a claim for benefits under the Hospital's OIAP, in violation of ERISA.  Christus argues that this claim also falls short because she cannot prove a "specific discriminatory intent."  Moreover, Stockton received approximately eight months of paid leave, in addition to the 90-day TDP assignment at full pay.  The court agrees that the record is devoid of any evidence in support of Stockton's claims under the FMLA or ERISA.   In fact, in her response to Christus's motion, Stockton failed to address these claims at all even though Christus clearly moved for summary judgment on them.   Consequently, Stockton is deemed to have abandoned these claims, rendering summary judgment proper.  *See Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007)  (stating that inadequately briefed issues are considered waived); *DIRECTV, Inc.*, 420 F.3d at 525-26; *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 653 (5th Cir.), *cert. denied*, 543 U.S. 979 (2004); *United States ex rel. Phillips v. L-3 Commc'ns Integrated Sys., L.P.*, No. 3:10-CV-1784, 2012 WL 3649699, at *9 (N.D. Tex. Aug.

36

24, 2012) (treating relator's conspiracy claim abandoned where he failed to respond to motion to dismiss); *accord United States v. Stanley*, 595 F. App'x 314, 317 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2891 (2015) (stating that a party's failure to raise an issue in response to a motion for summary judgment is a waiver); *Moore v. Delta Airlines, Inc.*, No. 3:10-CV-2241, 2012 WL 685414, at *5 (N.D. Tex. Mar. 1, 2012) (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)) (holding that the plaintiff abandoned any claims not addressed in her summary judgment response); *Penrod v. Bank of N.Y. Mellon*, 824 F. Supp. 2d 754, 762-63 (S.D. Tex. 2011) ("Plaintiffs' summary judgment response has abandoned the claim, offering no briefing on the subject."). Hence, Stockton's FMLA and ERISA retaliation claims must be rejected.

III.    Conclusion

Consistent with the foregoing analysis, Stockton has failed to establish beyond peradventure her claims for discrimination and failure to accommodate under the ADA. Accordingly, her Motion for Summary Judgment is DENIED.

Additionally, Stockton has failed to raise a genuine issue of material fact with respect to her claims under the ADA, the FMLA, or ERISA. Consequently, Christus is entitled to judgment as a matter of law. Thus, Christus's Motion for Summary Judgment is GRANTED.

SIGNED at Sherman, Texas, this 3rd day of February, 2017.

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE